John C. Kelly (012770)
Marvin C. Ruth (024220)
Katherine L. Hyde (025441)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 224-0999
F: (602) 224-6020
jkelly@cblawyers.com
mruth@cblawyers.com
khyde@cblawyers.com
*Attorneys for Applicants*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>HOME OPPORTUNITY, LLC,<br><br>Debtor. | Chapter: 7<br><br>Case No. 2:21-bk-04924-EPB<br><br>**APPLICATION TO CONFIRM ABSENCE OF AUTOMATIC STAY WITH RESPECT TO DEPOSIT ACCOUNTS HELD SOLELY BY APPLICANTS AT WESTERN ALLIANCE BANK PURSUANT TO 11 U.S.C. §§ 362, BANKRUPTCY RULE 4001, AND LOCAL RULE 4001-1** |
| WINDOW ROCK INVESTMENT OPERATIONS, LLC, a Delaware corporation; DIBS US, INC., a Delaware corporation; CADI US, LLC, a Delaware limited liability company; WRCOF ASSET TRUST 2017-1, a Delaware statutory trust; and CREDIT OPPORTUNITY HOLDINGS, LLC, a Delaware limited liability company,<br><br>Applicants,<br><br>v.<br><br>HOME OPPORTUNITY, LLC, Debtor; CHAPTER 7 TRUSTEE, ROBERT A. MACKENZIE,<br><br>Respondents. | **OR, IN THE ALTERNATIVE,**<br><br>**APPLICATION TO COMPEL TRUSTEE TO ABANDON ANY INTEREST IN DEPOSIT ACCOUNTS PURSUANT TO 11 U.S.C. §§ 541, 554 AND BANKRUPTCY RULE 6007**<br><br>**Property at issue:** Applicants' deposit accounts at Western Alliance Bank |

{00560250.4 }

Window Rock Investment Operations, LLC ("WRIO"), DIBS US, Inc. ("DIBS"), CADI US, LLC ("CADI"), WRCOF Asset Trust 2017-1 ("WAT2017-1") and Credit Opportunity Holdings, LLC ("COH") (collectively, "Applicants") hereby apply to this Court, pursuant to 11 U.S.C. §§ 105(a), 362, 541, 554(b); Bankruptcy Rule 4001, 6007; and Local Rule 4001-1 and 6007-1(b)(2), for an Order confirming the absence of the automatic stay with respect to five (5) bank deposit accounts (the "WR Accounts") solely owned and maintained by Applicants at Western Alliance Bank dba Alliance Bank of Arizona (the "Bank") and the funds held in the WR Accounts, because the WR Accounts and the funds therein are not property of the Debtor or its estate (the "Estate"), and thus, must be immediately released by the Bank to Applicants. In the alternative, Applicants request an Order compelling the Trustee to abandon to Applicants any purported interest in the WR Accounts, because any such interest has no benefit or value to the Estate.

This Application is supported by the following Memorandum of Points and Authorities and by the Declaration of Patrick Cardon ("Declaration") attached hereto as Exhibit 1 and incorporated herein by reference.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This is a straightforward matter. The Debtor, Home Opportunity, LLC, had no legal or equitable interest in the WR Accounts as of the petition date, and thus, the WR Accounts are not property of the Estate pursuant to 11 U.S.C. § 541, are of no benefit or value to the Estate, and are unavailable to satisfy the Estate's creditors. As the account documents make clear, the Debtor was not an owner or holder of the WR Accounts, and was not an authorized signatory on the WR Accounts. Instead, the WR Accounts are individually held by the separately organized non-debtor Applicant entities. Not surprisingly, the Debtor did not list the WR Accounts as property of the estate in its Schedules. [Dkt. 10] So why are we here?

Creditor Joseph Ware, in his capacity as Independent Administrator of the Estate of Evoughn Ware ("Ware") holds a judgment (the "Judgment") against the Debtor, *not the Applicants*, that he obtained in Illinois state court.[1] In his pre-petition efforts to collect on that Judgment, and despite evidence to the contrary, Ware represented to the Illinois state court, to the Bank, and to Applicants, that he can seize the WR Accounts and the funds therein because the Debtor purportedly (i) pledged the WR Accounts as collateral to secure a loan from the Bank, and thus (ii) must own the WR Accounts. Ware's premise and conclusion are both categorically false. As is plainly apparent upon review of the operative loan documents that Ware referenced, the Debtor never pledged the WR Accounts as collateral for the loan. Nor could it, because Applicants, who are not parties to the loan, are and have always been the sole owners of the WR Accounts. Nevertheless, Ware's misrepresentations to the Illinois state court and to the Bank have caused the Bank to impose an administrative hold on the WR Accounts, freezing the funds therein and denying Applicants access to more than $1,000,000 (collectively) of Applicants' own money. That has severely affected Applicants' ability to operate their businesses and caused ongoing harm.

Applicants have explained to Ware, in detail, why Ware's assertions regarding Debtor's purported ownership of the third-party WR Accounts are incorrect. Applicants have asked Ware to withdraw the Turnover Motion so that the Bank may release its administrative hold. To date, Ware has refused, insisting "this freeze will remain in place unless and until (1) the stay is modified and (2) your client's request to quash the third-party citation or my motion for turnover is granted." *See* Ex. L to Declaration. Of course, it is for this Court, not the Illinois state court, to decide what is and is not property of the estate. *See* 11 U.S.C. § 541.

For that reason, Applicants seek a Court order, pursuant to Local Rule 4001-1(a), (i) confirming the absence of the automatic stay with respect to the WR Accounts, (ii) on the

---

[1] Based on the Judgment, Ware filed a $10,975,392.81 proof of claim on July 13, 2021, that he alleges is "secured" by "all non-exempt property of debtor." [Claim 4-1]

express grounds that the Debtor had no interest in the WR Accounts as of the petition date, and thus, the WR Accounts are not property of the Estate subject to the automatic stay.

## II. JURISDICTION

1. The Debtor filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the District of Arizona on June 24, 2021.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157, 1334(b), and § 2201(a). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## III. FACTUAL BACKGROUND

### A. The Applicants are separately organized entities; the Debtor does not own or control the Applicants, nor do the Applicants own or control the Debtor

3. WRIO is a Delaware limited liability company authorized to do business and doing business in Maricopa County, Arizona. (See Decl., ¶ 5) WRIO is a real estate investment trust ("REIT") which holds investments in loans secured by real estate. (*Id.*)

4. DIBS is a Delaware corporation authorized to do business and doing business in Maricopa County, Arizona. (*Id.*, ¶ 6) DIBS is a taxable REIT subsidiary, which holds investments in real properties. (*Id.*)

5. CADI is a Delaware limited liability company authorized to do business and doing business in Maricopa County, Arizona. (*Id.*, ¶ 7) CADI is an investment company that holds investments in private equity. (*Id.*)

6. WAT2017-1 is a Delaware statutory trust authorized to do business and doing business in Maricopa County, Arizona. (*Id.*, ¶ 9) WAT2017-1 is a wholly-owned subsidiary of COH. (*Id.*) It holds investments in loans secured by real estate. (*Id.*)

7. COH is a Delaware limited liability company authorized to do business and doing business in Maricopa County, Arizona. (*Id.*, ¶ 8) COH is a wholly-owned subsidiary of WRIO. (Id.) It holds investments in Delaware statutory trusts. (*Id.*)

8.  The Debtor is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona. (*Id.*, ¶ 12) However:

    a.  None of Applicants is or has ever been a member or manager of the Debtor. (*Id.*, ¶ 13)

    b.  None of Applicants has or has ever had any ownership interest in the Debtor. (*Id.*, ¶ 14)

    c.  The Debtor is not and has never been a member or manager of any of Applicants. (*Id.*, ¶ 15)

    d.  The Debtor has no and has never had any ownership or other interest in any of Applicants. (*Id.*, ¶ 16)

9.  The Debtor is owned by Red Rock River, LLC ("RRR"), likewise a Delaware limited liability company with its principal place of business in Maricopa County, Arizona. (*Id.*, ¶ 12)

10. Applicants maintain and have deposited funds in the following five (5) separate deposit bank accounts (the "WR Accounts") at the Bank in Maricopa County, Arizona:

| Account Name | Account Number | Owner |
|---|---|---|
| WRIO Operating | 8011772657 | WRIO |
| DIBS Operating | 8011773135 | DIBS |
| Cadi US | 8255051688 | CADI |
| WAT2017-1 | 8869618183 | WAT2017-1 |
| Credit Opportunity Holdings | 8947213155 | COH |

(*Id.*, ¶¶ 19-24)

**B.  The Debtor and RRR (not Applicants) obtain a loan from the Bank.**

11. On June 22, 2017, the Debtor and RRR entered into a Loan and Security Agreement (the "Loan Agreement") and signed a Promissory Note (the "Note") in favor of the Bank. (*Id.*, ¶ 17) Pursuant to the Loan Agreement and the Note, the Bank loaned the Debtor and RRR the sum of Eight Million and no/100 Dollars ($8,000,000.00) (the "Loan"). (*Id.*; *see also* Decl. Ex. A (Loan Agreement) and Ex. B (Note))

12. The Loan Agreement was between the Debtor, RRR and the Bank only. (Ex. A to Decl. at 1, 33-34; Ex. B to Decl. at 7)

13. None of Applicants were parties to (or are even referenced in) the Loan, the Loan Agreement, or the Note. (*See* Exs. A, B to Decl. generally)

14. The Loan Agreement was collateralized by certain promissory notes and mortgages executed by homeowners in the Debtor's or RRR's favor, by deeds and other title documents related to any real property owned or acquired by the Debtor or RRR, by the funds in a collection account maintained by the Debtor or RRR at the Bank, and by any insurance or other proceeds generated by the disposition of the promissory notes, mortgages, deeds, or real property owned by the Debtor or RRR. (Ex. A to Decl. at 3, § 4.1.)

15. The Loan Agreement was not collateralized by the WR Accounts, by the funds in the WR Accounts, or by any other assets belonging to Applicants, or any of them. (*Id*.) The Loan Agreement, in Section 9.1, limited the Bank's rights and remedies to only those accounts maintained by the Debtor or RRR at the Bank. It did not provide the Bank with any right to seize or attach the WR Accounts or the funds in the WR Accounts. (*Id*. at 3, § 9.1.)

16. The Note similarly defined the collateral for the Loan as "certain personal property" of the Debtor and RRR, including "a security interest in, all monies, securities and other property of [the Debtor or RRR] now or hereafter in the possession of or on deposit with [the Bank]…including, without limitation, any account or deposit held jointly by [the Debtor or RRR] with any other person or entity…" (Ex. B to Decl. at 4, § 13.)

17. The Note did not define "collateral" to include any of the WR Accounts or any property belonging to Applicants. (*Id*.) The Note was not collateralized by the WR Accounts, by the funds in the WR Accounts, or by any other assets belonging to Applicants, or any of them. (*Id*.)

18. Neither the Debtor, nor RRR, nor any of Applicants pledged the WR Accounts or the funds in the WR Accounts as security or collateral for the Loan. (*See* Ex. A, B generally)

19. Neither the Loan Agreement nor the Note grant the Bank any security interest in the WR Accounts, or identify the WR Accounts as assets of the Debtor or RRR, or state that the WR Accounts have been pledged as collateral to secure the Loan. (*Id.*)

20. On August 5, 2019, the Debtor and RRR paid off the Loan and the Bank closed the Loan account. (Decl., ¶ 18)

### C. **Applicants (not the Debtor) open the WR Accounts in Arizona.**

21. Pursuant to the terms of the Loan Agreement, the Bank agreed to provide a favorable interest rate on the Loan so long as the Debtor, RRR and their "affiliates," as defined in the Loan Agreement, maintained a combined aggregate account balance at the Bank of not less than $1,000,000.00. (Ex. A to Declaration, at § 6.4.)

22. Approximately 10 months after the Loan was issued, the WR Entities opened deposit accounts at the Bank. (Decl. ¶ 19)

23. On April 5, 2018, WRIO opened an analyzed business checking account (account no. 8011772657) at the Bank (the "WRIO Account"). (*Id.*, ¶ 20; Ex. C to Decl.) As set forth in the account agreement, the Debtor was neither an authorized signer on the WRIO Account nor an account owner or holder, and the Debtor held and holds no ownership or other interest in the WRIO Account. (Ex. C to Decl.)

24. On April 5, 2018, DIBS opened an analyzed business checking account (account no. 8011773135) at the Bank (the "DIBS Account"). (*Id.*, ¶ 21; Ex. D to Decl.) As set forth in the account agreement, the Debtor was neither an authorized signer on the DIBS Account nor an account owner or holder, and the Debtor held and holds no ownership or other interest in the DIBS Account. (Ex. D to Decl.)

25. On April 5, 2018, CADI opened an analyzed business checking account (account no. 8255051688) at the Bank (the "CADI Account"). (*Id.*, ¶ 22; Ex. E to Decl.) As set forth in the account agreement, the Debtor was neither an authorized signer on the CADI Account nor

{00560250.4}

6

Case 2:21-bk-04924-EPB   Doc 17   Filed 07/23/21   Entered 07/23/21 13:50:47   Desc
Main Document    Page 7 of 16

an account owner or holder, and the Debtor held and holds no ownership or other interest in the CADI Account. (Ex. E to Decl.)

26. On April 12, 2018, WAT2017-1 opened an analyzed business checking account (account no. 8869618183) at the Bank (the "WAT2017-1 Account"). (*Id.*, ¶ 23; Ex. F to Decl.) As set forth in the account agreement, the Debtor was neither an authorized signer on the WAT2017-1 Account nor an account owner or holder, and held and holds no ownership or other interest in the WAT2017-1 Account. (Ex. F to Decl.)

27. On April 12, 2018, COH opened an analyzed business checking account (account no. 8947213155) at the Bank (the "COH Account"). (*Id.*, ¶ 24; Ex. G to Decl.) The Debtor was neither an authorized signer on the COH Account nor an account owner or holder, and held and holds no ownership or other interest in the COH Account. (Ex. G to Decl.)

28. All of the Debtor's assets and funds have always been kept separate from, and segregated from, Applicant's funds and assets, and the Applicants have always maintained the WR Accounts separately from the Debtor's maintenance of its own bank accounts. (Decl. ¶¶ 26-27)

29. Assuming Applicants are affiliates of the Debtor for purposes of the Loan Agreement, had any of Applicants closed any of the WR Accounts or withdrawn funds from the WR Accounts at any time, such that the combined aggregate account balance at the Bank (for the Debtor, RRR and the Applicants) fell below $1,000,000.00, the Bank had no right to halt the withdrawal, freeze the funds in the WR Accounts, or seize those funds for set-off purposes. (Ex. A to Decl. at § 6.4) The Bank's sole remedy, if the aggregate balance on hand for the Debtor, RRR and Applicants ever dipped under $1,000,000.00 as a result of Applicants, or any of them, closing or withdrawing funds from the WR Accounts, was to increase the interest rate on the Note payable by the Debtor by one half of one percent (0.5%) per annum. (*Id.*)

30. The fact that the Debtor and RRR may have been able to include the WR Account balances in the combined aggregate account balance at the Bank for purposes of paying a favorable interest rate on the Loan did not somehow transmute those WR Accounts into the Debtor's (or RRR's) property or make them "pledged" bank accounts.

31. Following the payoff and cancellation of the Loan in August of 2019, Applicants continued to maintain the WR Accounts at the Bank. (Decl. ¶ 28)

32. Applicants maintain and use the WR Accounts as operations accounts. (*Id.*, ¶ 29) Having unobstructed access to and use of the WR Accounts and the funds therein is critical to Applicants' businesses and continuing operations. (*Id.*)

33. As of the date of this Motion, Applicants collectively have more than $1,000,000.00 (collectively) on deposit in the WR Accounts. (*Id.*, ¶ 30; Ex. H (Account Statements) to Decl.)

D. **Ware obtains judgment against the Debtor (not Applicants), and proceeds to initiate collection proceedings against Applicants anyway.**

34. Ware sued the Debtor, RRR, and three other entities in Cook County (Illinois) Circuit Court (the "Circuit Court"), seeking damages for the death of his mother, Evoughn Ware, who died in a house fire in October of 2016 (the "Illinois Lawsuit"). (*Id.*, ¶ 31)

35. RRR and the three other entities were dismissed from the Illinois Lawsuit on summary judgment. (*Id.*) The case proceeded to a jury trial against the Debtor alone. (*Id.*) None of Applicants were parties to the Illinois Lawsuit. (*Id.*, ¶ 32)

36. After a trial in January of 2020, Ware obtained a Judgment against the Debtor in the amount of $9,689,948.18. (*Id.*, ¶ 33)

37. On May 26, 2021, Ware filed a "Motion for Entry of Turnover Order" (the "Turnover Motion") in Cook County (Illinois) Circuit Court (the "Circuit Court"). (*Id.*, ¶ 34; *see also* Ex. I (the Turnover Motion) to Decl.)

38. In the Turnover Motion, to which Ware attached copies of the Loan Agreement, the Note, and copies of account statements for the WR Accounts, Ware incorrectly alleged that the Debtor had pledged the WR Accounts as collateral for the Loan, and that the WR Accounts were assets of the Debtor that could be attached for purposes of (partially) satisfying the Judgment. (Ex. I to Decl.)

39. Specifically, Ware alleged "[i]n 2017, [Debtor] pledged 20 bank accounts at [Bank] as collateral to secure an $8 million loan, executing documents evincing its ownership of those accounts." (Ex. I to Decl. at ¶ 1) Ware then repeated that allegation two pages later, again averring that "[Debtor] pledged as collateral 20 bank accounts in which it had an interest with an aggregate balance of over $10 million as of the fall of 2017." (*Id.*, ¶ 8) In support of that allegation, Ware attached copies of monthly statements for the WR Accounts, which Ware again misrepresented as "pledged accounts." (*Id.*, ¶ 9)

40. Based on the foregoing misrepresentations, Ware improperly (and incorrectly) concluded, in summary fashion, that the "Pledged Accounts and their holdings are assets of the judgment debtor, Home Opportunity. It could not logically pledge assets which it did not own as collateral." (Ex. I to Decl. at ¶ 13)

41. In the Turnover Motion, and based upon the foregoing misrepresentations, Ware requested that the Circuit Court order the Bank to turn over (to Ware) all funds on deposit in the WR Accounts in partial satisfaction of the Judgment. (Ex. I to Decl. at ¶ 15)

42. On May 26, 2021, Ware sent a copy of the Turnover Motion and a "Notice of Remotely Conducted Proceedings" (the "Notice") to the Bank, putting the Bank on notice that the Turnover Motion would be presented to the Illinois state court. (Ex. J to Decl.)

E. **The Bank freezes the WR Accounts based on Ware's faulty allegations.**

43. Applicants and the WR Accounts are not located in Cook County, Illinois (*See* Decl. ¶¶ 5-9, 20-24) and are not subject to jurisdiction in Cook County, Illinois. Upon information and belief, Ware has never sought to domesticate the Judgment in Arizona, where

all Applicants operate, and where Applicants opened and funded the WR Accounts. Nevertheless, on June 10, 2021, after receiving the Turnover Motion and Notice, the Bank placed an administrative hold on all WR Accounts. (*Id.*, ¶ 36)[2]

44. As a result of the administrative hold, the WR Accounts were frozen, and Applicants have been denied access to the WR Accounts or to the funds therein. (*Id.*, ¶ 37)

45. The Bank froze the WR Accounts, purportedly based upon language in the deposit account agreements for the WR Accounts, which provides as follows: "If Bank receives conflicting instructions or a dispute arises as to authorization with regard to the handling of the Account, you agree Bank may place a hold on the Account until such conflict or dispute is resolved to Bank's satisfaction and Bank will not be liable for dishonored items as a result of such hold." (*Id.*, ¶ 38)

46. The Bank thus placed an administrative hold and froze the WR Accounts because of Ware's allegations in the Turnover Motion, and because Ware created a purported dispute or conflict with regard to Applicants' right to access the WR Accounts and their funds.

47. On June 30, 2021, counsel for Applicants sent counsel for Ware a letter explaining that Debtor had no interest in the WR Accounts and neither the Debtor nor Applicants had ever pledged the WR Accounts as collateral, as is evident on the face of the Loan Agreement, Note, and Bank Statements. (Ex. K to Decl.) In that letter, counsel explained that Ware's allegations to the contrary in the Turnover Motion were false, and they requested that Ware immediately withdraw the Turnover Motion. (*Id.*) Ware's counsel refused to withdraw the Turnover Motion or otherwise to assist in undoing the harm that he had created. (Ex. L to Decl.) In doing so, he ignored the pertinent points raised by Applicants and entirely failed to address the fact that the Loan Documents do not provide that Debtor pledged the WR

---

[2] Further, and upon information and belief, the Bank is an Arizona corporation authorized to do business and doing business in in Maricopa County, Arizona. It is unclear to what extent the Bank is subject to jurisdiction in Cook County, Illinois either.

Accounts as collateral, as Ware had misrepresented to the Illinois court and the Bank. (*Id.*) Instead, Ware's counsel asserted that he wanted an "explanation as to how [the Debtor] could contract to maintain minimum balances in accounts which it supposedly does not own or control." (*Id.*)

48. As of the date of this Motion, the WR Accounts remain frozen. (*Id.*, ¶ 40) The WR Entities have been severely harmed by the Bank's decision to place an administrative hold on, and freeze the funds in, and deny the WR Entities access to the WR Accounts, and the WR Entities continue to be harmed. (*Id.*)

49. Upon the Debtor's bankruptcy filing, Ware's collection action against the Debtor in Illinois state court (which has no jurisdiction over Applicants), was stayed pursuant to 11 U.S.C. § 362.

## V. ARGUMENT

### A. The WR Accounts are not property of the Estate.

50. Property of a bankruptcy estate is defined broadly under 11 U.S.C. § 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Pettit*, 217 F.3d 1072, 1077 (9th Cir.2000). While § 541(a)(1) includes all legal or equitable interests of the debtor in property as of the commencement of the case as estate property, state law determines the extent of such interests. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914 (1979). Here, the Debtor had (and has) no interest in the WR Accounts, and thus, the WR Accounts and the funds therein are not property of the Estate.

51. The Debtor and Applicants are separate legal entities. None of Applicants are members or managers or have any ownership interest whatsoever in the Debtor. Similarly, the Debtor is not a member or manager and has no ownership interest in any of Applicants.[3]

---

[3] The Debtor is not and has never been a member, manager, shareholder, director, officer, trustee or depositor of any of Applicants. Indeed, even if it were, courts have widely held that corporate assets of a non-debtor entity do not become part of the bankruptcy estate of a debtor shareholder. *See, e.g.,*

52. Further, each of the WR Accounts is solely owned by each respective WR Entity. (Exs. C-G of Decl.) None of the WR Accounts are held or maintained by the Debtor – jointly or otherwise. The Debtor never signed any account ownership documents for the WR Accounts. (*Id.*) Although the account agreements between each Applicant and the Bank expressly and specifically identify the account owner or holder, none of the account agreements identify the Debtor as an owner/holder of the accounts. Instead, each Applicant is listed as the sole "owner/account holder" with respect to each WR Account. Although the account agreements expressly and specifically identify each "authorized signer" on each WR Account, the Debtor is not listed as an authorized signatory for any of the WR Accounts. (*Id.*) The Debtor is not mentioned or referenced in any of the WR Accounts' bank statements. (Ex. H to Decl.) The Debtor has not scheduled the WR Accounts as assets of the Estate. [Dkt. 10] In short, the Debtor does not own, and has no interest in, the WR Accounts.

53. Further, and contrary to Ware's allegations in the Turnover Motion, the Debtor did not pledge the WR Accounts as collateral for the Loan. None of the Applicants were a party to the Debtor's Loan from the Bank, or to the Note, or to the Loan Agreement, and none of them signed the Loan documents. (Ex. A to Decl. at 1, 33-34; Ex. B to Decl. at 7) The Loan Agreement and Note do not reference the WR Accounts, much less (i) grant the Bank any security interest in the WR Accounts, or (ii) provide that the WR Accounts are assets of the Debtor or collateral for the Loan. (Ex. A, B. to Decl. generally)

54. Instead, as the Loan documents plainly state, the Debtor only pledged its *own* accounts as collateral for the Loan. The only parties who could have pledged the WR Accounts as collateral – Applicants – never agreed that the WR Accounts constituted or could be considered security for the Debtor's Loan obligations, and, more importantly, never agreed

---

*Movitz v. Todd*, 24 Fed. Appx. 707, 709 (9th Cir. 2001) (debtor shareholder had no ownership of the property of the non-debtor corporation in which the debtor shareholder held shares).

{00560250.4}　　　　　　　　　　　　　　　　　　　　　　12
Case 2:21-bk-04924-EPB   Doc 17   Filed 07/23/21   Entered 07/23/21 13:50:47   Desc
Main Document    Page 13 of 16

that the Debtor had an ownership interest in the WR Accounts even if they had been pledged as collateral (which they were not).

55. That the Bank may have kept track of the WR Accounts to determine whether the Debtor and its "affiliates" collectively kept at least $1,000,000 on hand in the Bank at all times would not constitute a pledge of those accounts by the "affiliates" as collateral. Nor does Applicants' decision to open bank accounts at the Bank somehow convert the WR Accounts into assets of the Debtor. The WR Accounts and the funds in the WR Accounts belong to Applicants only.

56. Every day that the WR Accounts remain frozen – every day that Applicants are denied access to their operating bank accounts and to the funds in those accounts - causes significant and continuing harm to Applicants. Without access to the WR Accounts, they cannot conduct business, or satisfy their obligations to their own debtors or investors.

### B. Court should confirm that WR Accounts are not property of the Estate and thus, not subject to the automatic stay.

57. The automatic stay only applies to "property of the estate," "property of the debtor," and acts to collect or recover claims against the debtor, or debts owed by the debtor. 11 U.S.C. § 362.

58. As set forth above, however, the WR Accounts are not property of the Estate, and thus, the Estate has no ownership or other interest in the WR Accounts, which will remain unavailable to satisfy the Estate's creditors, including Ware.

59. Ware's assertion (Ex. L to Decl.) that the WR Accounts must remain out of Applicants' reach "unless and until (1) the stay is modified and (2) your client's request to quash the third-party citation or my motion for turnover is granted," is nonsensical and misstates the law. Ware's judgment is against the Debtor only. If the WR Accounts are property of the Estate (and they are not), then this Court is the only venue for Ware to assert his claim to those assets. *See* 28 U.S.C. § 1334(e). If the WR Accounts are not property of

{00560250.4}
13
Case 2:21-bk-04924-EPB    Doc 17    Filed 07/23/21    Entered 07/23/21 13:50:47    Desc
Main Document    Page 14 of 16

the Estate (as set forth in detail herein), then there is nothing for Ware to pursue against the Applicants, who are not judgment debtors, in Illinois state court, which has no jurisdiction over Applicants in any event.

60. Consequently, the Court should (i) order that the automatic stay does not apply to WR Accounts, and (ii) order that the automatic stay does not prevent or restrict Bank from immediately providing Applicants unobstructed access to the WR Accounts, on the grounds that (iii) the WR Accounts were not property of the Debtor as of the petition date, and thus, not property of the Estate.

C. **Abandonment of the purported interest in the WR Accounts to Applicants is appropriate.**

61. Section 554(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the court may order the Trustee to abandon any property of the estate that is of inconsequential value and benefit to the estate." The WR Accounts are not just of inconsequential value or benefit to the Debtor; they do not belong to the Debtor.

62. To date, Ware is the only person or entity asserting, through an accusation in the Turnover Motion, that the WR Accounts are property of the Debtor. As set forth above, Ware is mistaken. Ware's assertions, however, have not only divested Applicants from access to their funds, but now require a determination from this Court that the Debtor has no interest in the WR Accounts. Contrary to Ware's contention (Ex. L to Decl.) that this will somehow be an issue for the Illinois state court to take up after a modification of the automatic stay, this Court has, and should exercise, the jurisdiction to determine what is and what is not property of the estate. *See* 11 U.S.C. § 541.

63. Here, the WR Accounts are not property of the estate, because they were not property of the Debtor as of the petition date. For that reason, the Trustee should be compelled to abandon any actual, contingent, or inchoate interest that the Estate might possibly have in

the WR Accounts by virtue of Ware's factually inaccurate accusations in his state court filings, and the Bank's subsequent freeze of the WR Accounts based on those accusations.

64. Further, the Court should order that any purported interest in the WR Accounts be abandoned to Applicants, the entities with documented ownership of the WR Accounts. *See e.g.*, *In re Malden Mills Indus., Inc.*, 303 B.R. 688, 700 (B.A.P. 1st Cir. 2004) ("Upon abandonment the property reverts to the party with the possessory interest"); *Matter of Popp*, 166 B.R. 697, 700 (Bankr. D. Neb. 1993) ("abandonment should be to the party with the superior possessory interest").

WHEREFORE, Applicants respectfully request that the Court enter an Order (a) confirming that the automatic stay does not apply to the WR accounts because they were not Debtor's property as of the petition date, and thus, are not property of the Estate subject to the stay and (b) ordering that the automatic stay does not bar the Bank from releasing the WR Accounts and the funds therein to Applicants, or in the alternative, (c) compelling the Trustee to abandon to Applicants any and all purported interest in the WR Accounts owned and maintained by Applicants at the Bank or in the funds held in the WR Accounts, as the WR Accounts are not property of the Estate.

DATED this 23rd day of July, 2021.

**COPPERSMITH BROCKELMAN PLC**

By: /s/ *Marvin C. Ruth*
John C. Kelly
Marvin C. Ruth
Katherine L. Hyde
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
*Attorneys for Applicants*