# Exhibit I

Exhibit I

FILED DATE: 5/26/2021 3:38 PM  2017L006009

FILED
5/26/2021 3:38 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2017L006009

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

|  |  |  |
|---|---|---|
| JOSEPH WARE, as Independent Administrator of the Estate of EVOUGHN WARE, | ) ) ) | 13475645 |
| Plaintiff/Judgment Creditor, | ) ) | |
| v. | ) ) | No. 2017 L 6009 |
| HOME OPPORTUNITY, LLC, | ) ) | |
| Defendant/Judgment Debtor | ) ) | |
| (WESTERN ALLIANCE BANCORPORATION, | ) ) ) | |
| Third-Party Citation Respondent). | ) ) | |

## MOTION FOR ENTRY OF TURNOVER ORDER

Now comes the Plaintiff/Judgment Creditor, JOSEPH WARE, as Independent Administrator of the Estate of EVOUGHN WARE ("**Ware**"), by and through his attorneys, BEERMANN LLP, and pursuant to 735 ILCS 5/2-1402, seeks the entry of turn over order from certain accounts of the Defendant/Judgment Debtor, HOME OPPORTUNITY, LLC ("**Home Opportunity**") with Third-Party Citation Respondent, WESTERN ALLIANCE BANCORPORATION ("**WAB**"). In support thereof, Ware respectfully states as follows:

### INTRODUCTION

1. In 2017, Home Opportunity pledged 20 bank accounts at WAB as collateral to secure an $8 million loan, executing documents evincing its ownership of those accounts. Ware now seeks the entry of a turnover order for the balance of the funds held in those accounts in partial satisfaction of his $9.6 million judgment.

Case 2:21-bk-04924-EPB   Doc 18-9   Filed 07/23/21   Entered 07/23/21 14:04:55   Desc
Exhibit I   Page 2 of 55

FILED DATE: 5/26/2021 3:38 PM    2017L006009

# BACKGROUND

2.    Both Home Opportunity and its sole member, Red Rock River LLC ("**RRR**"), are Delaware limited liability companies based out of Arizona. Both were organized for the sole purpose of owning—and collecting the profits from—thousands of "distressed" properties in low-income neighborhoods as part of a broader fund promising wealthy investors a 20% return on their money.

3.    Evoughn Ware perished in a house fire in a building owned by Home Opportunity. Ware, in his capacity as administrator of her estate, filed suit against Home Opportunity for negligence and for violations of the Illinois Smoke Detector Act.

4.    The matter proceeded to a jury trial and on January 22, 2020, the jury returned a verdict in Ware's favor and against Home Opportunity in the amount of $9,689,948.18. Ware initiated these supplemental proceedings shortly thereafter.

5.    In the course of said proceedings, Ware issued an initial and an amended third-party citation to discover assets to Western Alliance Bancorporation, the parent company of the financial institution at which the Cardon family entities banked.

6.    WAB's initial citation answer revealed that on June 22, 2017, Home Opportunity and RRR, as joint co-borrowers, executed a Loan and Security Agreement providing it with an $8 million non-revolving line of credit. **Exhibit A— WAB0032-0065.**[1]

---

[1] Copies of relevant documents produced as part of WAB's initial third-party citation Answer are attached hereto as **Exhibit A**.

FILED DATE: 5/26/2021 3:38 PM    2017L006009

7.      In order to secure that loan, Home Opportunity executed a Promissory Note granting WAB "a lien and a right of setoff against, and *** a security interest in:

> all monies, securities and other property of Borrower now or hereafter in the possession of or on deposit with [WAB], whether held in a general or special account or deposit including, without limitation, any account or deposit held jointly by Borrower with any other person or entity, or for safekeeping or otherwise, except to the extent specifically prohibited by law.
> **Exhibit A—WAB0028**

8.      According to WAB's documentation, Home Opportunity pledged as collateral 20 bank accounts in which it had an interest with an aggregate balance of over $10 million as of the fall of 2017 (the "**Pledged Accounts**"). The account numbers and balances of the Pledged Accounts as of September 30, 2017 are set forth on **Exhibit A—WAB0498**.

9.      Ware issued an amended third-party citation to WAB seeking information regarding these accounts. On May 21, 2021, WAB produced that information, which provided the balances of Home Opportunity's Pledged Accounts. As set forth below, and in greater detail on **Exhibit B**, the aggregate balance of the Pledged Accounts still in existence was approximately $1 million as of March 31, 2021:

FILED DATE: 5/26/2021 3:38 PM   2017L006009

| Account # | Entity | Ending Balance |
|---|---|---|
| xx2657 | Window Rock Investment Operations, LLC | $48,633 |
| xx3135 | DIBS US, Inc | $31,125 |
| xx7543 | Window Rock Capital Partners, LLC | $23,564 |
| xx1688 | Cadi US | $200,501 |
| xx8183 | WRCOF Asset Trust 2017-1 | $692,893 |
| xx3155 | Credit Opportunity Holdings, LLC | $6,834 |
| xx9749 | Window Rock Manager, LLC | $2,724 |
| | **TOTAL BALANCE AS OF 3/31/2021** | **$1,006,275** |

## ARGUMENT

10.     Section 2-1402 of the Code represents an efficient and expeditious process for the discovery of a judgment Home Opportunity's income and assets and to compel application of those assets to the payment of the judgment. *Bank of Aspen v. Fox Cartage, Inc.*, 126 Ill. 2d 307, 314 (1989).

11.     Supplemental proceedings pursuant to this section permit Ware to find any assets of Home Opportunity being held by third parties and apply those assets to satisfy the judgment. *R & J Construction Supply Co. v. Adamusik*, 2017 IL App (1st) 160778, ¶ 7.

12.     Paragraph (c) of section 1402 provides that when "assets or income of the judgment debtor not exempt from the satisfaction of a judgment" are discovered in a citation proceeding, this court may:

> Compel any person cited, other than the judgment debtor, to deliver up any assets so discovered, to be applied in satisfaction of the judgment, in whole or in part, when those assets are held under such circumstances that in an action by the judgment debtor he or she could recover them in specie or obtain a judgment for the proceeds or value thereof as for conversion or embezzlement.
> 735 ILCS 5/2–1402 (c)(3)

FILED DATE: 5/26/2021 3:38 PM 2017L006009

13. Here, by its own admission, the 20 Pledged Accounts and their holdings are assets of the judgment debtor, Home Opportunity. It could not logically pledge assets which it did not own as collateral.

14. The contents of these accounts -- $1.06 million as of March 31, 2021 – are not exempt from the satisfaction of Ware's Judgment.

15. Accordingly, WAB should be ordered to immediately turn over the full contents of the Pledged Accounts -- $1,006,275 as of March 31, 2021 -- to Ware in partial satisfaction of his Judgment.

WHEREFORE, Plaintiff/Judgment Creditor, JOSEPH WARE, as Independent Administrator of the Estate of EVOUGHN WARE, requests that this Court:

A. Entry of an Order requiring turnover of the non-exempt funds in the Pledged Accounts held by Western Alliance Bancorporation in partial satisfaction of this Court's Judgments against Home Opportunity; and

B. Grant him any additional relief this Court deems just and proper.

> **BEERMANN LLP**
> Attorneys for Joseph Ware
>
> By:/s/ *Matthew D. Elster*
> One of His Attorneys

Matthew D. Elster
**BEERMANN LLP**
Attorneys for Plaintiff/Judgment Creditor
161 North Clark Street #3000
Chicago, IL 60601
Tel: (312) 621-9700
mdelster@beermannlaw.com

FILED DATE: 5/26/2021 3:38 PM    2017L006009

# PROMISSORY NOTE

U.S. $8,000,000.00                                                June 22, 2017
                                                                 Phoenix, Arizona

**FOR VALUE RECEIVED,** RED ROCK RIVER LLC, a Delaware limited liability company and HOME OPPORTUNITY LLC, a Delaware limited liability company (collectively, the "Borrower"), hereby promises to pay to the order of WESTERN ALLIANCE BANK, an Arizona corporation ("Alliance"), at the office of Alliance located at 3033 West Ray Road, Chandler, Arizona 85226, the principal amount of up to Eight Million and No/100 Dollars ($8,000,000.00) or such lesser principal amount as from time to time shall be outstanding hereunder, as reflected in the books and records of Alliance, together with interest on the principal balance from time to time outstanding hereunder, from (and including) the date of disbursement until (but not including) the date of payment, at a per annum rate equal to the Stated Interest Rate specified below or, to the extent applicable, the Default Interest Rate specified below, in accordance with the following terms and conditions:

1.      Definitions.    As used herein, the following terms shall have the following meanings (all terms defined in this Section 1 or in other provisions of this Note in the singular to have the same meanings when used in the plural and vice versa):

"Additional Sums" has the meaning set forth in Section 14 of this Note.

"Default Interest Rate" has the meaning set forth in Section 4 of this Note.

"Event of Default" has the meaning set forth in Section 12 of this Note.

"LIBOR Rate" has the meaning set forth in Section 3 of this Note.

"Loan Agreement" has the meaning set forth in Section 7 of this Note.

"Loan Documents" has the meaning set forth in the Loan Agreement.

"Monthly Settlement Date" means the last day of each calendar month, or, if such date falls on a non-Business Day, the next Business Day; provided that the initial Monthly Settlement Date shall occur on July 31, 2017 and the final Monthly Settlement Date shall occur on the Maturity Date.

"Non-Revolving Loan Period" means the period beginning on the Closing Date and ending on the two (2) calendar year anniversary thereof.

"Note" means this Promissory Note.

"Stated Interest Rate" has the meaning set forth in Section 3 of this Note.

"Term Loan Period" means the period beginning on the first calendar day after the last calendar day of the Non-Revolving Loan Period and ending on the one (1) calendar year anniversary thereof.

FILED DATE: 5/26/2021 3:38 PM    2017L006009

2.     Contracted For Rate of Interest.   The contracted for rate of interest of the indebtedness evidenced hereby, without limitation, shall consist of the following:

(a)     The Stated Interest Rate, as from time to time in effect, calculated daily on the basis of actual days elapsed over a 360-day year, applied to the principal balance from time to time outstanding hereunder;

(b)     If applicable, the Default Interest Rate, as from time to time in effect, calculated daily on the basis of actual days elapsed over a 360-day year, applied to the principal balance from time to time outstanding hereunder;

(c)     All Additional Sums, if any.

Borrower agrees to pay an effective contracted for rate of interest which is the sum of the Stated Interest Rate referred to in Subsection 2(a) above, plus any additional rate of interest resulting from the application of the Default Interest Rate referred to in Subsection 2(b) above, if applicable, and the Additional Sums, if any, referred to in Subsection 2(c) above.

3.     Stated Interest Rate.   Except as provided in Section 4 below, the principal balance outstanding hereunder from time to time shall bear interest at the Stated Interest Rate.

(a)     During the Non-Revolving Loan Period, the Stated Interest Rate shall be equal to the greater of: (a) a per annum rate equal to 4.50% plus the LIBOR Rate from time to time in effect; and (b) five percent (5.00%) per annum.   The "LIBOR Rate" shall mean an amount equal to the variable rate of interest per annum, as adjusted from time to time, quoted by Alliance as Alliance's one (1) month LIBOR Rate based upon quotes from the London Interbank Offered Rate from the ICE Benchmark Administration Interest Settlement Rates, as quoted for U.S. Dollars by Bloomberg (rounded upwards to the nearest $1/100^{th}$ of one percent).   In the event such rate ceases to be available, Alliance may rely on any other service selected by Alliance providing comparable rate quotations.   Any increase or decrease in the Revolving Index Rate, for purposes of determining the Stated Interest Rate in effect hereunder, shall be effective on the day either such increase or decrease is announced or published, as the case may be.

(b)     During the Term Loan Period, the Stated Interest Rate shall be equal to the greater of:  (a) a per annum rate equal to 4.50% plus the LIBOR Rate from time to time in effect; and (b) five percent (5.00%) per annum.

(c)     Borrower acknowledges that neither the LIBOR Rate may represent the most favorable interest rate from time to time offered by Alliance to its borrowers, the LIBOR Rate may increase or decrease during the time this Note remains outstanding, and the amount by which the LIBOR Rate may increase or decrease is not limited as to increases or decreases that may occur on any day or while this Note remains outstanding.

4.     Default Interest Rate.   The Default Interest Rate shall be a per annum rate equal to the Stated Interest Rate plus 5.00%.   The principal balance outstanding hereunder from time to time shall bear interest at the Default Interest Rate from the date of the occurrence of an Event of Default hereunder until the earlier of:  (a) the date on which the principal balance outstanding hereunder, together with all accrued interest and other amounts payable hereunder, are paid in

2

WAB0026

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 8 of 55

00004200200062-3_0q31_20200820170018.pdf  26                                                          5/25/2021 9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

full; or (b)(i) if Borrower is specifically granted a right to cure such Event of Default in any of the Loan Documents, the date on which such Event of Default is timely cured in a manner satisfactory to Alliance or (ii) if no such right to cure is specifically granted, then the date on which Alliance, in its sole and absolute discretion, deems such Event of Default cured.

5.    Late Charge.  If any payment of principal and/or interest, or other amount is not received by Alliance within ten (10) days after its due date (other than the Maturity Date), then, in addition to the other rights and remedies of Alliance (including the payment of the Default Interest Rate), a late charge of (i) five percent (5.00%) of the amount due and unpaid; or (ii) $10.00, whichever is greater, will be charged to Borrower without notice to Borrower.  Such late charge shall be immediately due and payable.

6.    Principal Balance.  The principal balance outstanding hereunder at any time shall be the total amount of advances made hereunder by Alliance, less the total amount of payments of principal hereon, as reflected in the books and records of Alliance with respect to the indebtedness evidenced by this Note.  The principal balance outstanding under this Note at any time shall not exceed the principal amount first set forth above.

7.    Non-Revolving Credit/Term Loan.  This Note is the Promissory Note defined in the Loan and Security Agreement dated effective June 22 , 2017 between Borrower and Alliance (as amended from time to time, the "Loan Agreement").  Terms not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement.  During the Non-Revolving Loan Period, Alliance may make advances to Borrower from time to time hereunder, which advances will be of a non-revolving nature and may be made and repaid from time to time. During the Non-Revolving Loan Period, Borrower and Alliance contemplate a series of discretionary advances as provided herein even if the principal balance outstanding hereunder has previously been reduced to zero.  On the date on which the Non-Revolving Loan Period ends (the "Conversion Date"), and provided that no Event of Default and no event that, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default, has occurred and is continuing hereunder or under any other Loan Document, the principal hereof shall, without any further action by Alliance or Borrower, convert to a term loan (the "Term Loan") in accordance with the terms of this Note and the Loan Agreement.

8.    Requests for Advances.  Advances hereunder may be made by Alliance from time to time during the Non-Revolving Loan Period on behalf of the Alliance by the oral or written request of Borrower's Authorized Officer.  Any advance hereunder shall be deemed to have been made to or for the benefit of Borrower when made pursuant to the oral or written request of any one of the aforenamed individuals.

9.    Payments.  This Note shall be payable as follows:

(a)    During Non-Revolving Loan Period.  During the Non-Revolving Loan Period, Borrower shall (i) make monthly payments of accrued and unpaid interest at the Stated Interest Rate or, to the extent applicable, the Default Interest Rate, payable in arrears on each Monthly Settlement Date; and (ii) deposit proceeds less closing costs (including any fees payable to asset manager) for the payoff or sale of any Pledged Note or REO, to be applied in accordance with Section 2.4(c) of the Loan Agreement.

5965525v3/22359-0098

WAB0027

00004200200062-3_0q31_20200820170018.pdf  27    5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

(b)     During Term Loan Period.  Borrower shall make monthly payments of principal and interest during the Term Loan Period, commencing on the Monthly Settlement Date first occurring after the one-month anniversary of the Conversion Date and continuing on the each Monthly Settlement Date thereafter until the last day of the Maturity Date.  Each monthly payment shall be each in an amount sufficient to fully-amortize the outstanding principal balance over one hundred twenty (120) months.  On the Maturity Date, all remaining principal and accrued and unpaid interest shall be paid in full.

10.     Application of Payments.  Payments received by Alliance with respect to the indebtedness evidenced hereby shall be applied as provided in the Loan Agreement.

11.     Prepayments.  During either the Non-Revolving Loan Period or Term Loan Period, payments of principal may be made at any time, or from time to time, in whole or in part, without penalty, provided that all previously matured interest and other charges accrued to the date of prepayment are also paid in full.  Notwithstanding any prepayment of principal under this Note:  (1) there will be no change in the due date or amount of scheduled payments due hereunder unless each of Borrower and Alliance, in each party's sole and absolute discretion, agrees in writing to such change; and (2) Borrower's obligations hereunder shall continue in effect, and this Note shall remain outstanding, unless and until the principal balance outstanding hereunder, together with all accrued interest and other amounts payable hereunder or in any of the Loan Documents, are paid in full. For the avoidance of doubt, amounts may not reborrowed once prepaid.

12.     Events of Default; Acceleration.  The occurrence of any one or more Events of Default, as defined in the Loan Agreement, shall constitute an "Event of Default" hereunder, and upon such Event of Default, the entire principal balance outstanding hereunder, together with all accrued interest and other amounts payable hereunder, at the election of Alliance, shall become immediately due and payable, subject to any cure periods provided in the Loan Documents.

13.     Collateral.

(a)     Borrower's obligations under this Note are secured by a security interest in certain personal property of Borrower pursuant to the Loan Documents.

(b)     In addition to all liens upon, and rights of setoff against, the monies, securities or other property of Borrower or any other person or entity who is or may become liable hereunder given to Alliance by law, Alliance shall have a lien and a right of setoff against, and Borrower hereby grants to Alliance a security interest in, all monies, securities and other property of Borrower now or hereafter in the possession of or on deposit with Alliance, whether held in a general or special account or deposit including, without limitation, any account or deposit held jointly by Borrower with any other person or entity, or for safekeeping or otherwise, except to the extent specifically prohibited by law.  After the occurrence and during the continuance of an Event of Default, every such lien, right of setoff and security interest may be exercised without demand upon or notice to Borrower.  No lien, right of setoff, or security interest shall be deemed to have been waived by any act or conduct on the part of Alliance, by any neglect to exercise such right of setoff or to enforce such lien or security interest, or by any delay in so doing.

WAB0028

00004200200062-3_0q31_20200820170018.pdf   28     5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

14.     Additional Sums.  All fees, charges, goods, things in action or any other sums or things of value, other than the interest resulting from the Stated Interest Rate, the Default Interest Rate, as applicable, paid or payable by Borrower (collectively, the "Additional Sums"), whether pursuant to this Note, the Loan Documents or any other document or instrument in any way pertaining to this lending transaction, or otherwise with respect to this lending transaction, that, under the laws of the State of Arizona, may be deemed to be interest with respect to this lending transaction, for the purpose of any laws of the State of Arizona that may limit the maximum amount of interest to be charged with respect to this lending transaction, shall be payable by Borrower as, and shall be deemed to be, additional interest, and for such purposes only, the agreed upon and "contracted for rate of interest" of this lending transaction shall be deemed to be increased by the rate of interest resulting from the Additional Sums.  Borrower understands and believes that this lending transaction complies with the usury laws of the State of Arizona; however, if any interest or other charges in connection with this lending transaction are ever determined to exceed the maximum amount permitted by law, then Borrower agrees that: (a) the amount of interest or charges payable pursuant to this lending transaction shall be reduced to the maximum amount permitted by law; and (b) any excess amount previously collected from Borrower in connection with this lending transaction that exceeded the maximum amount permitted by law, will be credited against the principal balance then outstanding hereunder.  If the outstanding principal balance hereunder has been paid in full, the excess amount paid will be refunded to Borrower.

15.     Waivers.  Except as set forth in this Note, the Loan Agreement or the other Loan Documents, to the extent permitted by applicable law, Borrower, and each person who is or may become liable hereunder, severally waive and agree not to assert:  (a) any homestead or exemption rights; (b) demand, diligence, grace, presentment for payment, protest, notice of nonpayment, nonperformance, extension, dishonor, maturity, protest and default; and (c) recourse to guaranty or suretyship defenses (including, without limitation, the right to require the Alliance to bring an action on this Note).  Alliance may extend the time for payment of or renew this Note, release collateral as security for the indebtedness evidenced hereby or release any party from liability hereunder, and any such extension, renewal, release or other indulgence shall not alter or diminish the liability of Borrower or any other person or entity who is or may become liable on this Note except to the extent expressly set forth in a writing evidencing or constituting such extension, renewal, release or other indulgence.

16.     No Waiver by Alliance.  No delay or failure of Alliance in exercising any right hereunder shall affect such right, nor shall any single or partial exercise of any right preclude further exercise thereof.

17.     GOVERNING LAW; PLACE OF PERFORMANCE.  THIS NOTE IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN THE STATE OF ARIZONA, AND THE LAWS OF SUCH STATE (WITHOUT REGARD TO ITS PROVISIONS OF CHOICE OF LAWS) AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THIS NOTE, EXCEPT TO THE EXTENT OTHERWISE SPECIFIED IN ANY OF THE LOAN DOCUMENTS.  THIS NOTE IS PERFORMABLE IN MARICOPA COUNTY, ARIZONA.  VENUE OF ANY LITIGATION INVOLVING THIS NOTE SHALL BE MAINTAINED IN AN APPROPRIATE

5965525v3/22359-0098

WAB0029

00004200200062-3_0q31_20200820170018.pdf   29

5/25/2021   9:00:18 PM

STATE OR FEDERAL COURT LOCATED IN MARICOPA COUNTY, ARIZONA, TO THE EXCLUSION OF ALL OTHER VENUES.

18. **Time of Essence.** Time is of the essence of this Note and each and every provision hereof.

19. **Amendments.** No amendment, modification, change, waiver, release or discharge hereof and hereunder shall be effective unless evidenced by an instrument in writing and signed by the party against whom enforcement is sought.

20. **Severability.** If any provision hereof is invalid or unenforceable, the other provisions hereof shall remain in full force and effect and shall be liberally construed in favor of Alliance in order to effectuate the other provisions hereof.

21. **Binding Nature.** The provisions of this Note shall be binding upon Borrower and the heirs, personal representatives, successors and assigns of Borrower, and shall inure to the benefit of Alliance and any subsequent holder of all or any portion of this Note, and their respective successors and assigns. Alliance may from time to time transfer all or any part of its interest in this Note and the Loan Documents, without notice to Borrower.

22. **Notice.** All notices, requests, consents and other communications hereunder shall be in writing and shall be delivered personally or mailed by first-class registered or certified mail, postage prepaid, or by facsimile transmission, overnight delivery service or email, postage prepaid, to Alliance at its address first set forth above and to Borrower at its address shown on the signature pages of this Note or at such other address as may be designated by it by notice to the other party. All notices and other communications given to any party hereto in accordance with the provisions of this Note shall be deemed to have been given on the date of receipt.

23. **Section Headings.** The section headings set forth in this Note are for convenience only and shall not have substantive meaning hereunder or be deemed part of this Note.

24. **Construction.** This Note shall be construed as a whole, in accordance with its fair meaning, and without regard to or taking into account any presumption or other rule of law requiring construction against the party preparing this Note. If the day on which any action to be performed or any payment made hereunder is not a business day, such action shall be performed or such payment made on the immediately succeeding business day.

25. **Joint and Several Liability.** Each of the Borrowers shall be jointly and severally liable hereunder with respect to all Obligations, as defined in the Loan Agreement, regardless of which of the Borrowers actually receives the proceeds of the Loans or the benefit of any other extensions of credit hereunder, or the manner in which the Borrower or the Lender account therefor in their respective books and records.

[Signature page follows]

6

5965525v3/22359-0098

WAB0030

00004200200062-3_0q31_20200820170018.pdf  30

5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

**IN WITNESS WHEREOF,** Borrower has executed this Note as of the date first set forth above.

BORROWER:

RED ROCK RIVER LLC, a Delaware limited liability company

By: Window Rock Manager, LLC, a Delaware limited liability company
Its: Manager

By: _____
Patrick Cardon
Its: Authorized Officer

HOME OPPORTUNITY LLC, a Delaware limited liability company

By: Red Rock River LLC, a Delaware limited liability company
Its: Manager

By: _____
Patrick Cardon
Its: Authorized Officer

Address of Borrower:

2915 East Baseline Road, Suite 109
Gilbert, AZ 85234
Attn: Patrick Cardon
Email: pcardon@windowrock.com

[Signature page to Promissory Note]

**WAB0031**

00004200200062-3_0q31_20200820170018.pdf  31                                                    5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT is dated effective June 22, 2017 between WESTERN ALLIANCE BANK, an Arizona corporation ("Alliance"), with a place of business located at 3033 West Ray Road, Chandler, Arizona 85226, and RED ROCK RIVER LLC, a Delaware limited liability company and HOME OPPORTUNITY LLC, a Delaware limited liability company (collectively, the "Borrower"), whose address is 2915 East Baseline Road, Suite 109, Gilbert, AZ 85234.

The parties agree as follows:

1.       DEFINITIONS AND CONSTRUCTION.

      1.1     Definitions. As used in this Agreement, the following terms shall have the following definitions:

"Accounting Principles" means all financial information provided to Alliance and computation of all financial covenants will be made in accordance with accounting principles applied consistently with those applied in the preparation of the financial statements provided to Alliance prior to the date of this Agreement.

"Account Funds" has the meaning set forth in Section 2.4(a).

"Advance" or "Advances" means borrowings from time to time in accordance with this Agreement.

"Affiliate" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.

"Agreement" means this Loan and Security Agreement and any extensions, riders, supplements, notes, amendments, or modifications to or in connection with this Loan and Security Agreement.

"Alliance" has the meaning set forth in the preamble to this Agreement.

"Alliance Expenses" means all costs, fees and expenses (including taxes, photocopying, notarization, telecommunication and insurance premiums) required to be paid by Borrower under any of the Loan Documents that are paid or advanced by Alliance; fees, costs and premiums relating to documentation, cash management fees, filing, recording, title insurance, publication, appraisal or broker's opinions of value (including periodic Collateral appraisals), real estate survey, real property taxes on any real property, should Alliance elect to pay them pursuant to the terms of this Agreement, custodian and search fees assessed, paid, or incurred by Alliance in connection with Alliance's transactions with Borrower; costs and expenses incurred by Alliance in determining, from time to time, the Borrowing Base; costs and expenses incurred by Alliance in the asset reviews set forth in Section 2.7; costs and expenses incurred by Alliance in preserving the value of the Collateral; costs and expenses incurred by Alliance in the disbursement of funds to Borrower (by wire transfer or otherwise); charges paid or incurred by Alliance resulting from the dishonor of checks; costs and expenses paid or incurred by Alliance

1

WAB0032

Case 2:21-bk-04924-EPB   Doc 18-9   Filed 07/23/21   Entered 07/23/21 14:04:55   Desc
Exhibit I   Page 14 of 55

00004200200062-3_0q31_20200820170018.pdf  32                         5/25/2021 9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; costs and expenses paid or incurred by Alliance in examining Borrower's Books; costs and expenses of third party claims or any suit paid or incurred by Alliance in enforcing or defending the Loan Documents; and Alliance's attorneys' fees and expenses incurred in advising, structuring, drafting, reviewing, administering, amending, terminating, enforcing (including attorneys' fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning Borrower or any guarantor of the obligations), defending, or concerning the Loan Documents, irrespective of whether suit is brought.

"Asset Value" means an amount agreed to by Alliance and Borrower including the sum of (a) with respect to any Pledged Notes, the sum of Borrower's cost basis on such Pledged Notes; and (b) with respect to REO, the aggregate fair market value of such REO as determined by an appraisal ordered and accepted by Alliance.

"Authorized Officer" means any manager or officer of Borrower, any Person authorized by law, or other Person designated in writing as an authorized officer by Borrower to Alliance.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), as amended, and any successor statute.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Borrower's Books" means all of Borrower's books and records including all ledgers; records indicating, summarizing, or evidencing Borrower's properties or assets (including the Collateral) or liabilities; all information relating to Borrower's business operations or financial condition; and all computer programs, disc or tape files, printouts, runs, or other computer prepared information, and the equipment containing such information.

"Borrower's Loan Amount" means the total principal amount outstanding on any Pledged Note.

"Borrowing Base" means an amount equal to the sum of:

(1)     Sixty-five percent (65%) of the Asset Value of Performing Pledged Notes, plus

(2)     Fifty-five percent (55%) of the Asset Value of Non-Performing Notes; plus

(3)     Fifty-five percent (55%) of the Asset Values of REO; less

(4)     Any portion of a single Pledged Note in excess of 10% of the Committed Sum (unless any such Pledged Note is otherwise approved for inclusion by Alliance); less

(5)     The total outstanding Principal Balance of the Loans.

5958030v4/22359-0098

00004200200062-3_0q31_20200820170018.pdf  33

FILED DATE: 5/26/2021 3:38 PM    2017L006009

Alliance has no obligation, at any time, to advance funds in excess of the Committed Sum.

"Borrowing Base Certificate" means, as of any date of preparation, a certificate setting forth the Borrowing Base in substantially the form of Exhibit A attached hereto, prepared by and certified by an Authorized Officer of Borrower.

"Business Day" means any day that is not a Saturday, Sunday, or any other day on which national banks are authorized or required to close.

"Change of Control" shall be deemed to have occurred when Kastlerock, Window Rock Capital Partners, or Window Rock Manager (as the case may be) fails to directly or indirectly Control Borrower.

"Closing Date" means the date of the initial Advance.

"Code" means the Uniform Commercial Code as enacted in the State of Arizona, as amended from time to time.

"Collateral" means all of the following, whether now existing or hereafter acquired: the Pledged Note Files, the REO Files, the funds in the Collection Account and all products and proceeds whether tangible or intangible, of any of the foregoing including proceeds of insurance covering any or all of the foregoing, and any and all accounts, money, deposit accounts, judgments, attachments, claims for relief, levies, causes of action or other tangible or intangible property resulting from the sale, foreclosure, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof.

"Collection Account" has the meaning set forth in Section 2.4(a).

"Committed Sum" means Eight Million and No/100 Dollars ($8,000,000.00) or such lesser amount as may be outstanding on the Conversion Date, in each case (a) reduced on the date of each scheduled payment under the Promissory Note by the principal amount of each such scheduled payment during the Term Loan Period only, and (b) reduced pursuant to the request of Borrower upon ten (10) days' prior written notice.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract, or otherwise.

"Conversion Date" means the date on which the Non-Revolving Loan Period ends.

"Custodial Agreement" means any custodial agreement entered into between a Custodian and Alliance reflecting an agreement to act as custodian or Bailee on behalf of Alliance respecting some or all of the Collateral.

"Custodian" means Metasource, LLC, or another Person acting as Alliance's custodian respecting some or all of the Collateral.

3

WAB0034

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 16 of 55

00004200200062-3_0q31_20200820170018.pdf  34                                    5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

"EBITDA" means net income, less income or plus loss from discontinued operations and extraordinary items, plus income taxes, plus interest expense, plus depreciation, depletion, and amortization.

"Equity" means the total contributed capital of Borrower plus fund-to-date earnings, less fundraising costs, management fees and other offsets to equity as required by Accounting Principles, each as reported on Borrower's consolidated balance sheets.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, or any predecessor, successor, or superseding laws of the United States of America, together with all regulations promulgated thereunder.

"Event of Default" has the meaning set forth in Section 8.

"FEIN" means Federal Employer Identification Number.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Guaranty" means the Carve-Out Guaranty Agreement in favor of Alliance made by Patrick Cardon, in form and substance satisfactory to Alliance, whereby Guarantor guarantees repayment of all or a portion of the Obligations.

"Guarantor" means Patrick Cardon.

"Indebtedness" means all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet, and in any event including: (a) all obligations of Borrower for borrowed money; (b) all obligations of Borrower evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations of Borrower in respect of letters of credit, letter of credit guaranties, bankers acceptances, interest rate swaps, controlled disbursement accounts, or other financial products; (c) all obligations under capitalized leases; (d) all obligations or liabilities of others secured by a lien or security interest on any property or asset of Borrower, irrespective of whether such obligation or liability is assumed; and (e) any obligation of Borrower guaranteeing or intended to guarantee (whether guaranteed, endorsed, co-made, discounted, or sold with recourse to Borrower) any indebtedness, lease, dividend, letter of credit, or other obligation of any other Person.

"Indemnified Persons" means Alliance and its parents, subsidiaries, affiliates and participants, and each of their officers, directors, agents, employees, trustees, receivers, executors, and administrators, and the heirs, successors, and assigns of all of the foregoing, except for third-party purchasers of real property at foreclosure or from Alliance after foreclosure or deed in lieu of foreclosure.

"Insolvency Proceeding" means any action commenced by or against any Person under any provision of the Bankruptcy Code or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions,

4

WAB0035

000004200200062-3_0q31_20200820170018.pdf  35                                                     5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM  2017L006009

extensions generally with its creditors, or proceedings seeking receivership, reorganization, arrangement, or other similar relief.

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Kastlerock" means Kastlerock, LLC, an Arizona limited liability company.

"Loans" means the Revolving Loans and the Term Loan, collectively.

"Loan Documents" means this Agreement, the Promissory Note, the Guaranty, any other note or notes executed by Borrower or Guarantor and payable to Alliance, and any other agreement entered into in connection with this Agreement, together with every other agreement, note, document, contract or instrument to which Borrower and Alliance now or in the future may be a party and which may be required by Alliance in connection with, or as a condition to, the execution of this Agreement and every amendment, modification or substitution therefor.

"Losses" means any and all actual losses, liabilities, contingent liabilities, damages, obligations, claims, actions, suits, proceedings, disbursements, penalties, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs of counsel retained by Alliance to advise and represent Alliance with respect to matters related hereto, including, without limitation, fees incurred pursuant to 11 U.S.C. §101 et seq. and all other professional or consultants' fees and expenses), whether or not an action or proceeding is commenced or threatened.

"Maturity Date" means the last day of the Term Loan Period.

"Monthly Settlement Date" means the last day of each calendar month, or, if such date falls on a non-Business Day, the next Business Day; provided that the initial Monthly Settlement Date shall occur on July 31, 2017 and the final Monthly Settlement Date shall occur on the Termination Date.

"Non-Performing Pledged Note" means a Pledged Note which has been more than ninety (90) days past due.

"Non-Revolving Loan" and "Non-Revolving Loans" have the meanings set forth in Section 2.1.

"Non-Revolving Loan Period" means the period beginning on the Closing Date and ending on the two (2) calendar year anniversary thereof.

"Note Mortgage" means each deed of trust, mortgage, security agreement (inclusive of a security agreement in an installment sales contract with respect to a contract for deed), or other document or instrument encumbering real or personal property, which serves as collateral for the repayment of the Pledged Notes.

"Obligations" means all loans, advances, debts, principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), premiums, liabilities

5

WAB0036

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 18 of 55

00004200200062-3_0q31_20200820170018.pdf  36                                                    5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

(including all amounts charged to Borrower's loan account pursuant to any Loan Document authorizing Alliance to charge Borrower's loan account), obligations, fees, guaranties, covenants, and duties owing by Borrower to Alliance of any kind and description under or pursuant to or evidenced by the Loan Documents, due or to become due, now existing or hereafter arising, and including any debt, liability, or obligation owing from Borrower to others that Alliance may have obtained by assignment or otherwise, and further including all interest not paid when due and all Alliance Expenses that Borrower is required to pay or reimburse by the Loan Documents, by law, or otherwise.

"Performing Pledged Note" means a Pledged Note which has not been more than ninety (90) days past due evidenced by such Pledged Note.

"Permitted Liens" means: (a) liens for unpaid taxes which are not at imminent risk of foreclosure or automatic divestiture of title; (b) exceptions listed in the title insurance, if any, or property profiles in respect of the real property which serves as collateral for the repayment of the Pledged Notes.

"Person" means and includes natural persons, corporations, limited liability companies, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations or associations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which Borrower or any ERISA Affiliate sponsors or maintains or to which Borrower or any ERISA Affiliate makes, is making, or is obligated to contribute.

"Pledged Note" means each promissory note or other evidence of indebtedness (inclusive of an installment sales contract with respect to a contract for deed) executed by a third party in favor of Borrower (or assigned to Borrower by valid allonge, endorsement or other assignment document), including any amendments thereto, which is pledged to Alliance.

"Pledged Note File" means and shall include: (a) the Pledged Note bearing all intervening endorsements, or a Lost Note Affidavit (as defined in the Custodial Agreement) with applicable changes reasonably acceptable to Alliance, endorsed to blank, (b) a conformed copy of the Note Mortgage bearing the original recording information (or in the case of a contract for deed, either a conformed copy of the deed with recording information or an original of the deed), (c) an original "Assignment of Mortgage" in blank for each Pledged Note Mortgage (or in the case of a contract for deed, an original "assignment of the contract and a deed each in blank for such property", in form and substance acceptable for recording and signed in the name of Borrower by an authorized Person on behalf of Borrower, (d) the originals or copies of recorded intervening assignments of mortgage, if any, with evidence of recording thereon, showing an unbroken chain of title from the originator thereof to Borrower (or, in the case of a MERS Designated Mortgage Loan, MERS), (e) the original attorney's opinion of title and abstract of title or the original or copy of mortgagee (or in the case of a contract for deed, owner's) title insurance policy, or if the mortgagee (or, as applicable, owner's) title insurance policy has not been issued, a copy of the irrevocable commitment to issue the same, related to the Note Mortgage, and (f) if any of the above documents has been executed by a person holding a power

6

FILED DATE: 5/26/2021 3:38 PM 2017L006009

of attorney for Borrower, as notified to the Custodian in writing, an original of such power of attorney.

"Principal Balance" means the aggregate unpaid principal balance of the Promissory Note as of any date of determination.

"Promissory Note" means the promissory note, dated as of the Closing Date, in the maximum principal amount of Eight Million and No/100 Dollars ($8,000,000.00), executed by Borrower and payable to the order of Alliance, in form and substance satisfactory to Alliance, and all amendments, extensions, renewals, replacements, increases, and modifications thereof.

"Protective Advances" means amounts actually paid by Borrower to governmental agencies or other Persons to reduce or pay in full senior liens or delinquent taxes, municipal charges or assessments, or environmental fees or costs on property encumbered by any Note Mortgage.

"REO" means real property acquired by Borrower through purchase or exercise of foreclosure, deed in lieu of foreclosure or other remedies, including property subject to installment land sale contracts.

"REO File" means (a) a copy of the trustee's deed, sheriff's deed, referee's deed, or other granting deed, with evidence of recording thereon, evidencing the ownership of the related REO by any Borrower, (b) a special warranty deed or grant deed in appropriate form for recording from a Borrower to "blank" or, if Alliance elects, a mortgage or deed of trust securing the Obligations, on all of the subject real and personal property in form and content satisfactory to Alliance, (c) the original attorney's opinion of title and abstract of title or the original or copy of a title insurance policy, or if the mortgagee title insurance policy has not been issued, a copy of the irrevocable commitment to issue the same, insuring a Borrower as owner of the REO property, (d) if any of the above documents has been executed by a person holding a power of attorney for a Borrower, as notified to the Custodian in writing, an original of such power of attorney; and (e) such other documents as Alliance may require in its sole discretion.

"Servicer" means Statebridge Company, LLC; or a different servicing agent approved by Alliance.

"Solvent" means, with respect to any Person on a particular date, that on such date: (a) at fair valuations, all of the properties and assets of such Person are greater than the sum of the debts, including contingent liabilities, of such Person, (b) the present fair salable value of the properties and assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person is able to realize upon its properties and assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts beyond such Person's ability to pay as such debts mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's properties and assets would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged. In computing the

7

FILED DATE: 5/26/2021 3:38 PM 2017L006009

amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

"Stated Interest Rate" has the meaning set forth in the Promissory Note.

"Term Loan" has the meaning set forth in Section 2.1.

"Term Loan Period" means the period beginning on the first calendar day after the last calendar day of the Non-Revolving Loan Period and ending on the one (1) calendar year anniversary thereof.

"Termination Date" has the meaning set forth in Section 3.3.

"Voidable Transfer" has the meaning set forth in Section 15.8.

"Window Rock Capital Partners" means Window Rock Capital Partners LLC, a Delaware limited liability company.

"Window Rock Manager" means Window Rock Manager, LLC, a Delaware limited liability company.

1.2     Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with Accounting Principles. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrower on a consolidated basis unless the context clearly requires otherwise.

1.3     Code. Any terms used in this Agreement which are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

1.4     Construction. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or"  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Section, subsection, clause, schedule, and exhibit references are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the Loan Documents to this Agreement or any of the Loan Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements, thereto and thereof, as applicable.

1.5     Schedules and Exhibits. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.     LOAN AND TERMS OF PAYMENT.

WAB0039

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 21 of 55

00004200200062-3_0q31_20200820170018.pdf   39                                    5/25/2021  9:00:18 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

2.1    Non-Revolving Loans and Term Loans.  Subject to and upon the terms and conditions of this Agreement, during the Non-Revolving Loan Period, Alliance agrees to make one or more Advances on a non-revolving basis (hereinafter called, individually, a "Non-Revolving Loan" and, collectively, the "Non-Revolving Loans") to Borrower in an aggregate principal amount at any one time outstanding up to but not exceeding the Committed Sum. Within the limit of the Committed Sum in effect from time to time, during the Non-Revolving Loan Period, Borrower may borrow and repay at any time in whole or in part (subject to Section 2.4(c)) without penalty and from time to time from the Closing Date to the expiration of the Non-Revolving Loan Period (the "Commitment Termination Date"). For the avoidance of doubt, amounts may not reborrowed once repaid.  The Principal Balance may not exceed the Committed Sum at any time, and the Borrower shall have the option to reduce the Committed Sum at any time upon notice to Alliance.  Upon the expiration of the Non-Revolving Loan Period, and provided that no Event of Default has occurred and is continuing, the Non-Revolving Loans shall, without any further action by Alliance or Borrower, convert to a term loan (the "Term Loan") in accordance with the terms of the Promissory Note.

2.2    Promissory Note.  The Loans shall be evidenced by, be repayable, and accrue interest in accordance with, the Promissory Note.  Subject to the terms and conditions in this Agreement, the Promissory Note, and the other Loan Documents, Borrower may borrow and repay under the Promissory Note during the Non-Revolving Loan Period in whole or in part (subject to Section 2.4(c)).  For the avoidance of doubt, amounts may not reborrowed once repaid. The unpaid Principal Balance of the Promissory Note shall be repaid as provided therein.

2.3    Advances.

(a)    Subject to the terms and conditions of this Agreement, Alliance agrees to make one or more Advances to Borrower secured by Collateral in an amount requested by Borrower, but not to exceed the Borrowing Base.  In connection with each Advance, the Pledged Notes, including the security interests securing the Pledged Notes, shall be assigned to Alliance by Borrower delivering to Alliance (or its Custodian as directed by Alliance) the Pledged Note Files and/or the REO Files.

(b)    At any time, if the unpaid Principal Balance of the Loans exceeds the Borrowing Base, Borrower shall, within thirty (30) days after notice from Alliance:  (i) pay the difference to Alliance; or (ii) provide to Alliance a lien and security interest in additional collateral with a Borrowing Base sufficient to cure the applicable shortfall and otherwise reasonably acceptable to Alliance.

(c)    Alliance shall have no obligation to make Advances hereunder to the extent they would cause the outstanding obligations under this Section 2.3 to exceed the Committed Sum, less the current unpaid Principal Balance of the Loans, plus amounts on deposit in the Collection Account.

(d)    Alliance is authorized to make Advances under this Agreement based upon written request of Borrower's Authorized Officer.  Any Advance requested by Borrower and made by Alliance hereunder shall be made to such

5958030v4/22359-0098

WAB0040

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 22 of 55

00004200200062-3_0q31_20200820170018.pdf  40                                    5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

deposit accounts of Borrower as Borrower's Authorized Officer shall direct. Amounts borrowed pursuant to this Section 2.3 may be repaid at any time during the term of this Agreement.

2.4     Collection of Accounts and Application of Payments to Loans.

(a)     The Collection Account.  Borrower has granted a security interest to Alliance in the Collateral, including the Collection Account, pursuant to the terms of this Agreement.  Except as otherwise agreed by both parties in writing, all proceeds of accounts and other Collateral, upon receipt or collection, shall be deposited on a monthly basis into a deposit account of Borrower established with Alliance (the "Collection Account").  Funds so deposited ("Account Funds") may be used by Borrower in Borrower's sole discretion, including, without limitation, to be swept into Borrower's separate operating accounts or distributed to Borrower's members, unless an Event of Default shall have occurred and be continuing.

(b)     Payment of Accounts by Borrower's Account Debtors.  Borrower or Servicer shall be entitled to collect checks for payment from Borrower's account debtors, provided that Borrower or Servicer causes all such payments to be deposited into the Collection Account in the manner contemplated in Section 2.4(a).  Until deposited, Borrower or Servicer will hold all such payments and proceeds in trust for Alliance without co-mingling such funds with other funds or property of Borrower or Servicer, as applicable.  All deposits held in the Collection Account shall constitute proceeds of Collateral and shall not constitute payment of the Obligations.

(c)     Amount Due Upon Liquidation of Pledged Note or REO.  Upon the payoff or sale of any Pledged Note or any REO, Borrower shall deposit or instruct Servicer to deposit the proceeds less closing costs (including any fees payable to the asset manager) for such payoff or sale in the Collection Account, and Alliance shall apply to the outstanding Obligations an amount equal to the lesser of (A) the total proceeds deposited, (B) one hundred twenty percent (120%) of the Borrowing Base of the Asset Value attributed to the released Pledged Note or REO (as such amount has been reduced from time to time pursuant to the terms of the Agreement with the further understanding that any amounts applied to the Obligations in excess of the applicable Borrowing Base of the Asset Value shall be applied to the remaining Asset Values on a pro rata basis), and (C) the total outstanding Obligations; the remainder of the proceeds shall remain in the Collection Account to be swept into Borrower's separate operating account pursuant to the terms of Section 2.4(a).

(d)     Application of Payments During Default.  During the existence of an Event of Default, Alliance may withdraw Account Funds deposited to the Collection Account and pay down borrowings on the Loans by applying such Account Funds on the next Monthly Settlement Date.

5958030v4/22359-0098

WAB0041

00004200200062-3_0q31_20200820170018.pdf   41                                                                          5/25/2021 9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

2.5     Crediting Payments; Application of Collections. The receipt of any wire transfer of funds, check, or other item of payment from Borrower to Alliance shall be applied to provisionally reduce the Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds and is made to the appropriate deposit account of Alliance or unless and until such check or other item of payment is honored when presented for payment.   Should any check or item of payment not be honored when presented for payment, then Borrower shall be deemed not to have made such payment, and interest shall be recalculated accordingly.    Anything to the contrary contained herein notwithstanding, any wire transfer, check, or other item of payment shall be deemed received by Alliance only if it is received into Alliance's operating account on or before 3:00 p.m. Phoenix, Arizona time.   If any wire transfer, check, or other item of payment is received into Alliance's operating account after 3:00 p.m. Phoenix, Arizona time it shall be deemed to have been received by Alliance as of the opening of business on the immediately following Business Day.

2.6     Statements of Obligations.   Alliance may render statements to Borrower of the Obligations, including principal, interest, fees, and including an itemization of all charges and expenses constituting Alliance Expenses owing, and such statements shall be conclusively presumed to be correct and accurate absent manifest error and constitute an account stated between Borrower and Alliance unless, within forty-five (45) days after receipt thereof by Borrower, Borrower shall deliver to Alliance written objection thereto describing the error or errors contained in any such statements.

2.7     Fees.  Borrower shall pay to Alliance the following fees:

(a)     Origination Fee.  Borrower shall pay, out of the initial Advance, to Alliance a fully-earned and non-refundable origination fee equal to $80,000.00, which fee shall be due and payable upon the Closing Date.

(b)     Collateral Review Fees.  Borrower shall pay Alliance collateral review fee of Seventy-Five Dollars ($75.00) per applicable Pledged Note (payable only once per Pledged Note), which fee shall be due and payable monthly in arrears on the first day of the month after such Pledged Note is pledged to Alliance.  Upon execution of this Agreement, Alliance shall provide Borrower a one-time $20,000 credit for the payment of Collateral Review Fees payable pursuant to this provision.

(c)     Financial Audit/Collateral Exam Fees.   From and after the occurrence and during the continuance of an Event of Default, Borrower shall pay Alliance's actual out-of-pocket costs and expenses incurred, in connection with any collateral exams, audits, inspections or valuations conducted by or on behalf of Alliance of any Collateral or of the Borrower's operations or business, together with any related actual, out-of-pocket costs and expenses incurred by Alliance. Collateral exams, audits, inspections or valuations conducted by or on behalf of Alliance while an Event of Default does not exist shall be at Alliance's sole cost and expense, and shall not be considered an Alliance Expense.

3.     CONDITIONS; TERM OF AGREEMENT.

5958030v4/22359-0098

WAB0042

FILED DATE: 5/26/2021 3:38 PM 2017L006009

3.1     Conditions Precedent to Initial Advance. The obligation of Alliance to fund the initial Advance is subject to the fulfillment, to the satisfaction of Alliance in its sole discretion, of each of the following conditions:

(a)     The representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of the funding, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)     No Event of Default or event which with the giving of notice or passage of time would constitute an Event of Default shall have occurred and be continuing as of the date of the funding nor shall either result from the making of the funding;

(c)     No injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of such funding shall have been issued and remain in force by any governmental authority against Borrower, Alliance, or any of their Affiliates;

(d)     Borrower shall have delivered to the Custodian each Pledged Note File and REO File;

(e)     Alliance shall have received each of the Loan Documents, duly executed by Borrower or Guarantor, as applicable;

(f)     Borrower shall have provided evidence satisfactory to Alliance that its lien in the Collateral shall be a lien of first-priority (subject to Permitted Liens);

(g)     Alliance shall have received a certificate from the manager or members of Borrower, attesting to the resolutions of such members and managers authorizing its execution and delivery of all of the documents evidencing this Agreement and the other Loan Documents to which Borrower is a party and authorizing specific officers, managers or members of Borrower to execute the same;

(h)     Alliance shall have received copies of each Borrower's formation documents and operating agreements or member agreements, as amended, modified, or supplemented as of the Closing Date, certified by the managers or members of each Borrower, as applicable;

(i)     Alliance shall have received a certificate of status with respect to each Borrower by the Secretary of State of their respective states of formation, which certificates shall indicate that such entities are in good standing;

5958030v4/22359-0098

WAB0043

000042002000062-3_0q31_20200820170018.pdf  43

5/25/2021 9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

(j)     Borrower shall have confirmed to Alliance that each property encumbered by a Note Mortgage and securing a Pledged Note, and each REO, is insured by a policy of casualty insurance meeting the requirements of Section 6.12 hereof;

(k)     reserved;

(l)     Payment of fees and reimbursable costs and expenses due under this Agreement through the date of initial Advance, including without limitation all legal expenses incurred through the date of the closing of this Agreement, shall have been made to Alliance;

(m)     Evidence Borrower is licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary shall have been provided to Alliance;

(n)     A Customer Identification Information Form and such other forms and verification as Alliance may need to comply with the U.S.A. Patriot Act and other applicable laws and regulations shall have been completed by Borrower;

(o)     Borrower shall provide a Borrowing Base Certificate computed as of a date not more than thirty (30) days prior to such Advance.

(p)     No material adverse change shall have occurred relative to Borrower, Borrower's business activities, operations and projections, the Collateral, or the liens, security interest, or rights of Alliance since the date of the most recent financial statements of Borrower delivered to Alliance, in each case which would materially adversely effect Borrower's ability to perform its obligations under this Agreement; and

(q)     Such other documents as Alliance in its reasonable discretion may require.

3.2     Conditions Precedent to Subsequent Advances.  The following shall be conditions precedent to all subsequent Advances:

(a)     the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Advance as though made on and as of such date except (i) to the extent the subject matter of such representation or warranty relates to a particular date specified therein, in which case such representation shall be true and correct in all material respects as of such specified date, or (ii) to the extent such representation or warranty is no longer true as a result of the passage of time and/or the conduct of Borrower, provided that Borrower has complied with the covenants contained in the Loan Documents.;

13

(b)     no Event of Default shall have occurred and be continuing on the date of such Advance nor shall either result from the making of the Advance;

(c)     no injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the making of such Advance shall have been issued and remain in force by any governmental authority against Borrower, Alliance, or any of their Affiliates;

(d)     Borrower shall have delivered to Custodian each Pledged Note File and REO File; and

(e)     At Alliance's request, Borrower shall have confirmed to Alliance, within thirty (30) days after the applicable subsequent Advance, evidence satisfactory to it that all of the property encumbered by the Note Mortgages, and all REO, is insured by policies of insurance acceptable in form and substance to Alliance.

3.3     Term.  This Agreement shall become effective upon the execution and delivery hereof by Borrower and Alliance and shall continue in full force and effect until all Obligations are paid in full.  Borrower may request Advances from the date the conditions set forth in Section 3.1 are satisfied until the earlier of (the earliest of these dates, the "Termination Date"):  (i) the Commitment Termination Date; (ii) the date Borrower terminates the Loans, or (iii) the date Alliance terminates the Loans during the existence and continuance of an Event of Default.  If not earlier due as provided herein, all outstanding principal and unpaid accrued interest shall be due and payable on the Termination Date.

3.4     Effect of Termination.  On the earlier of (i) the Maturity Date, (ii) the date Borrower terminates the Loans, or (iii) the date Alliance terminates the Loans during the existence and continuance of an Event of Default, all Obligations immediately shall become due and payable without notice or demand.  No termination of this Agreement, however, shall relieve or discharge Borrower of Borrower's duties, obligations, or covenants hereunder, and Alliance's continuing security interests in the Collateral shall remain in effect until all Obligations have been fully and finally discharged and Alliance's obligation to provide Advances hereunder is terminated.

3.5     Early Termination by Borrower.  Borrower has the option, at any time, to terminate this Agreement by paying to Alliance in full, in cash, without penalty, all outstanding amounts under the Loan Documents.  Notwithstanding the foregoing, Borrower may be subject to certain prepayment penalties pursuant to the terms and conditions of the Promissory Note.  Alliance agrees to execute and cause to be filed or recorded, as applicable, any releases necessary to evidence such termination and release of the Collateral.

4.     SECURITY INTEREST.

4.1     Grant of Security Interest. Borrower hereby grants to Alliance a continuing security interest in all currently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents.

14

FILED DATE: 5/26/2021 3:38 PM   2017L006009

Alliance's security interests in the Collateral shall attach to all Collateral without further act on the part of Alliance or Borrower. Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, Borrower has no authority, express or implied, to dispose of any item or portion of the Collateral, except for sales and payoffs in the ordinary course of its business or as provided in this Section 4.

4.2    Negotiable Collateral. In the event that any Collateral, including proceeds, is evidenced by or consists of negotiable collateral, Borrower shall, immediately upon the request of Alliance, endorse and assign such negotiable collateral to Alliance and deliver physical possession of such negotiable collateral to Alliance.

4.3    Maintenance of Collateral; Collection on Pledged Notes. In the Pledged Note Files, Borrower will cause to be delivered promptly to Custodian each of the original Pledged Notes or a Lost Note Affidavit properly endorsed (by allonge or otherwise) by Borrower, or Borrower's seller directly, in favor of Alliance or Alliance's nominee. In the Pledged Note Files, Borrower will cause to be delivered promptly to Alliance for perfecting security interests if Alliance elects, an assignment of mortgagee's interest in each Note Mortgage from Borrower, or Borrower's seller directly, to Alliance, in recordable form; provided that such assignment shall not be recorded by Alliance unless there is an Event of Default that is continuing. All allonges, endorsements, and assignments shall be in a form satisfactory to Alliance in its reasonable discretion.

4.4    Compromise or Settlements with Respect to Pledged Notes. Subject to limitations contained herein to the contrary, and provided that no Event of Default has occurred and is continuing, Borrower or its Servicer shall service and administer the Pledged Notes and the Note Mortgages in its own name. Such administration shall include, without limitation, corresponding and negotiating with the makers and/or guarantors of the Pledged Notes, collection or other proceedings under and pursuant to the Pledged Notes and related documents, entering into agreements with the makers and/or guarantors of the Pledged Notes, and taking such action as Borrower deems necessary and/or appropriate to collect upon the Pledged Notes.

4.5    Exercise of Rights and Remedies with Respect to Default Under Pledged Notes. Borrower shall notify Alliance in advance of any foreclosure action brought under a Note Mortgage. In addition to other provisions contained herein, all notices to be sent to the makers of the Pledged Notes shall be sent in the name of Borrower, unless otherwise required by law. All foreclosure proceedings are to be conducted in the name of an Affiliate of Borrower, unless otherwise required by law.

Provided that no Event of Default has occurred and is continuing, should Borrower request that Alliance re-deliver a Pledged Note and/or deliver a reassignment of a Note Mortgage for purposes of enforcement of any of Borrower's remedies under the applicable Pledged Note, Alliance shall deliver or authorize the Custodian to deliver the requested documents within two (2) business days following Borrower's request therefor provided that commercially reasonable escrow or other trust arrangements are made for the receipt and handling of the delivered documents, all without any adjustment in the Borrowing Base unless and until such Pledged Note is liquidated.

5958030v4/22359-0098

WAB0046

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 28 of 55

000004200200062-3_0q31_20200820170018.pdf   46                                              5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

4.6     Release of Security Interests in the Pledged Notes. Upon payoff of a Pledged Note or upon the sale of a  Pledged Note or REO in Borrower's oridinary course of business, Alliance shall cause the prompt return of the applicable Pledge Note File or REO File to Borrower.

4.7     Delivery of Additional Documentation Required. At any time upon the request of Alliance, Borrower shall execute and deliver to Alliance all financing statements, continuation financing or other documents that Alliance may reasonably request, to perfect and continue to perfect Alliance's security interests in the Collateral.

4.8     Power of Attorney. Borrower hereby irrevocably makes, constitutes, and appoints Alliance (and any of Alliance's officers, employees, or agents designated by Alliance) as Borrower's true and lawful attorney, with power to upon the occurance and continuance of an Event of Defualt:  (a) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against Account Debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to Account Debtors; (b) send requests for verification of Accounts; (c) endorse Borrower's name on any checks, notices, acceptances, money orders, drafts, or other item of payment or security that may come into Alliance's possession;  (d) notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Alliance, to receive and open all mail addressed to Borrower, and to retain all mail relating to the Collateral and forward all other mail to Borrower; (e) make, settle, and adjust all claims under Borrower's policies of insurance and make all determinations and decisions with respect to such policies of insurance; and (f) settle and adjust disputes and claims respecting the accounts or Pledged Notes directly with account debtors or the makers thereof, for amounts and upon terms which Alliance determines to be reasonable, and Alliance may cause to be executed and delivered any documents and releases which Alliance determines to be necessary.   The appointment of Alliance as Borrower's attorney, and each and every one of Alliance's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and Alliance's obligation to extend credit hereunder is terminated.

4.9     Right to Inspect. Alliance (through any of its officers, employees, or agents) shall have the right, from time to time hereafter, during Borrower's business hours and after reasonable notice, to inspect Borrower's Books and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral.

4.10     Setoff.  If an Event of Default has occurred and is continuing, Alliance shall have the right to set off and apply against the Obligations in such manner as Alliance may determine, at any time and without notice to Borrowers, any and all deposits (general or special, time or demand, provisional or final, excluding amounts held in safekeeping or in trust accounts) or other sums at any time credited by or owing from Alliance to any Borrower whether or not the Obligations are then due. The rights and remedies of Alliance hereunder are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Alliance may have.

5958030v4/22359-0098

5. REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants to Alliance as follows in this Section 5. Any request for an Advance will be deemed a representation by Borrower that all of the following representations and warranties are true, correct and complete as of the time of the request, except (i) to the extent the subject matter of such representation or warranty relates to a particular date specified therein, in which case such representation shall be true and correct as of such specified date, or (ii) to the extent such representation or warranty is no longer true as a result of the passage of time and/or the conduct of Borrower, provided that Borrower has complied with the covenants contained in the Loan Documents..

5.1     No Prior Encumbrances. Borrower has good and indefeasible title to the Collateral, free and clear of liens, claims, security interests, or encumbrances, except for Permitted Liens.

5.2     Bona Fide Obligation. To the best of Borrower's knowledge, each Pledged Note is a bona fide, good, and valid obligation of the account debtor thereunder, and, there are no facts which impairs or will impair the validity of any such Pledged Note.

5.3     No Defenses or Setoffs. To the best of Borrower's knowledge, each Pledged Note and each Note Mortgage is free of any claim for credit, deduction, discount, allowance, defense (including the defense of usury), dispute, counter-claim, or setoff.

5.4     Enforceable Agreements. To the best of Borrower's knowledge, each Pledged Note and Note Mortgage is enforceable according to its terms against each named account debtor thereon or trustor thereunder, and reasonably complies with all applicable federal, state, and local laws, regulations, and requirements.

5.5     Correct Loan Terms.  To the best of Borrower's knowledge, each Pledged Note correctly sets forth the loan terms between Borrower and the account debtor thereunder, including, without limitation, the interest rate applicable thereto.

5.6     Further Advances on Pledged Notes. To the best of Borrower's knowledge, there are no further advances or lending or other obligations to be made by the holder of any Pledged Note to the makers thereof, except as otherwise disclosed to Alliance at or prior to the time of pledging of the applicable Pledged Note.

5.7     Compliance with Laws. A To the best of Borrower's knowledge, all state and federal laws (including any applicable usury and/or truth-in-lending statutes) have been complied with in conjunction with the Collateral, the non-compliance with which would have an material adverse impact on the value, enforceability, or collectability of the Collateral.

5.8     Authority To Assign. Borrower has such title to the Pledged Notes and Note Mortgages as it acquired, and full right and authority to pledge, assign and encumber the same.

5.9     FEIN. Borrower's federal identification numbers have been provided to Alliance.

17

FILED DATE: 5/26/2021 3:38 PM 2017L006009

5.10    Due Organization and Qualification. Borrower is duly organized and existing and in good standing under the laws of the state of its formation and qualified and licensed to do business in any state where the failure to be so licensed or qualified would reasonably be expected to have a material adverse effect on the business, operations, condition (financial or otherwise) of Borrower, or on the value of the Collateral to Alliance.

5.11    Due Authorization; No Conflict. The execution, delivery, and performance of the Loan Documents are within Borrower's limited liability company or trust powers, as the case may be, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in any Borrower's formation documents nor will they constitute an event of default under any material agreement to which a Borrower is a party or by which its properties or assets may be bound.

5.12    Litigation. There are no actions or proceedings pending by or against Borrower before any court or administrative agency which would materially and adversely affect the ability of Borrower to perform its obligations hereunder and Borrower does not have knowledge or belief of any pending or threatened in writing, litigation, governmental investigations, or claims, complaints, actions, involving Borrower, or the Obligations, except for ongoing collection matters in which a Borrower is the plaintiff, that, if decided adversely to Borrower, would materially impair the prospect of repayment of the Obligations or materially impair the value or priority of Alliance's security interests in the Collateral.

5.13    No Material Adverse Change in Financial Condition. All financial statements relating to Borrower or Guarantor of the Obligations that have been delivered by Borrower to Alliance have been prepared in accordance with Accounting Principles and fairly present Borrower's (or such Guarantor's, as applicable) financial condition as of the date thereof and Borrower's results of operations for the period then ended.  There has not been a material adverse change in the financial condition of Borrower (or Guarantor) since the date of the latest financial statements submitted to Alliance on or before the Closing Date.

5.14    Solvency. Borrower and Guarantor are Solvent. No transfer of property is being made by Borrower or Guarantor and no obligation is being incurred by Borrower or Guarantor in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrower or Guarantor.

5.15    Employee Benefits. There are no outstanding liabilities under Title IV of ERISA with respect to any Plan maintained or sponsored by Borrower or any ERISA Affiliate.

6.    AFFIRMATIVE COVENANTS.

Borrower covenants and agrees that, as long as any credit hereunder shall be available and until full and final payment of the Obligations, and unless Alliance shall otherwise consent in writing, Borrower shall do all of the following:

6.1    Collateral.  Borrower shall provide to Alliance within five (5) Business Days after each Advance the originals of the Pledged Notes acquired with such Advance endorsed to Alliance in form reasonably acceptable to Alliance.  Borrower shall provide to

18

WAB0049

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 31 of 55

00004200200062-3_0q31_20200820170018.pdf  49                                                      5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM    2017L006009

Alliance within five (5) Business Days after each Advance evidence that assignment(s) of the Note Mortgages (in form reasonably acceptable to Alliance) to Borrower have been forwarded to Alliance or its Custodian, at the request of Alliance.

6.2    Debt to Equity Ratio. Commencing on the Closing Date and measured quarterly on the last date of each calendar quarter on a trailing three months basis, Borrower shall maintain a Debt-to-Equity Ratio at all times of no greater than 1.00:1.00. For purposes of this Agreement, the term "Debt-to-Equity Ratio" means the aggregate sum of all outstanding Obligations of Borrower divided by Equity of the Borrower.

6.3    EBITDA. Borrower shall maintain EBITDA of not less than $400,000.00 per quarter, as measured quarterly on a trailing three months basis. Notwithstanding Section 8.3 below, in the event Borrower is not in compliance of this Section 6.3, Borrower shall, have thirty (30) days after notice from Allianceto cure such default. Lender agrees that it will review Borrower's financial statements from time to time and may (but shall not be obligated to) reduce the EBITDA requirement in its sole discretion.

6.4    Compensating Balances. Commencing on the Closing Date, Borrower's and its affiliates combined average unrestricted aggregate deposit account balances with Alliance shall not be less than $1,000,000.00, as measured quarterly on a trailing three months basis on the last date of each calendar quarter. In the event this covenant is not met for any calendar quarter, in addition to any other remedies available to Alliance, the Stated Interest Rate set forth in the Promissory Note shall increase automatically by one half of one percent (.50%) per annum for the quarter in which the compensating balances in this section are not maintained. This covenant will be tested quarterly and to the extent that the average unrestricted aggregate deposit account balances once again exceed $1,000,000.00, the interest rate shall be re-set to the Stated Interest Rate.

6.5    Secured Pledged Notes. On any date of measure, no single Pledged Note shall be in excess of 10% of the Committed Sum.

6.6    Accounting System. Borrower shall maintain a standard and modern system of accounting in accordance with Accounting Principles with ledger and account cards or computer tapes, discs, printouts, and records pertaining to the Collateral which contain information as from time to time may be reasonably requested by Alliance.

6.7    Financial Statements, Reports, Certificates. Borrower agrees to deliver to Alliance: (a) as soon as available, but in any event within thirty (30) days after the end of each quarter during each of Borrower's fiscal years prior to the termination, a company prepared balance sheet, income statement, and cash flow statement covering Borrower's operations during such period; (b) within thirty (30) days after the end of each month a Borrowing Base Certificate, a detailed portfolio loan report detailing all loans and corresponding activity, including, but not limited to, interest and principal payments and collections, and deposit reconciliation report; and (c) by April 30 of each of Borrower's fiscal years prior to termination, financial statements of Borrower for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Alliance and certified, without any qualifications, by such accountants to have been prepared in accordance with Accounting Principles. Borrower's audited financial

5958030v4/22359-0098

WAB0050

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 32 of 55

00004200200062-3_0q31_20200820170018.pdf  50                                                    5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

statements shall include a balance sheet, profit and loss statement, and cash flow statement, and, if prepared, an accountants letter to management. All of Borrower's financial statements may be consolidated with its sole member's financial statements in accordance with Accounting Princples.

6.8     Tax Returns.  Borrower agrees to deliver or cause to be delivered to Alliance copies of Borrower's state and federal income tax returns, together with any schedules and amendments thereto, within thirty (30) days after the filing thereof with the state taxing authority or Internal Revenue Service, including any authorized extensions of filing deadlines.

6.9     Guarantor Reports.  Borrower agrees to deliver, or to cause Guarantor to deliver, to Alliance copies of Guarantor's state and federal income tax returns, together with any schedules and amendments thereto, within thirty (30) days of the filing thereof with the state taxing authority or Internal Revenue Service, including any authorized extensions of filing deadlines.  Borrower further agrees to deliver, or to cause Guarantor to deliver, to Alliance updated annual personal financial statements at the time no later than April 30 of each year.

6.10    Taxes.  Except for Permitted Liens, all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrower or any of its property have been paid as of the date of this Agreement, and shall hereafter be paid in full, before delinquency or before the expiration of any extension period.  Borrower shall make due and timely payment or deposit of all federal, state, and local taxes, assessments, or contributions required of it by law, and will execute and deliver to Alliance, on demand, appropriate certificates attesting to the payment thereof or deposit with respect thereto. Borrower will make timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Alliance with proof satisfactory to Alliance indicating that Borrower has made such payments or deposits. Except for Permitted Liens, Borrower shall pay, or shall cause to be paid, in full, before delinquency or before the expiration of any extension period, all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against any of the makers under the Pledged Notes relating to the property which secures the Pledged Notes.

6.11    Insurance.

(a)     Borrower will obtain and maintain, or cause the owners of the real property encumbered by the Note Mortgages to obtain and maintain, (i) insurance of the type necessary to insure the applicable real property improvements and chattels for an amount equal to the appraised value of the improvements and chattels, against any loss by fire, lightning, windstorm, hail, explosion, aircraft, smoke damage, vehicle damage, and other risks from time to time included under "extended coverage" policies, but in any event in amounts sufficient to prevent Borrower from becoming a co-insurer under such polices, and (ii) combined single limit bodily injury and property damages insurance against any loss, liability, or damages on, about, or relating to each parcel of real property, in an amount of not less than One Million Dollars ($1,000,000), with such deductibles as Borrower determines in its reasonable discretion.

20

WAB0051

FILED DATE: 5/26/2021 3:38 PM    2017L006009

(b)    All insurance required herein shall be written by companies of recognized financial standing and shall be reasonably satisfactory to Alliance.

(c)    Borrower shall give Alliance prompt notice of any loss covered by such insurance and Alliance shall have the right to adjust any loss to the extent of Borrower's rights to do so.  Any monies received by Borrower as payment for any loss under any insurance policy including, but not limited to, the insurance policies mentioned above, shall be deposited to the Collection Account.

(d)    Borrower will obtain and maintain, or shall use commercially reasonable efforts to cause the owners of any real property encumbered by Note Mortgages to obtain and maintain, insurance substantially in the form required under Section 6.12(a) for all of the property which secures the Pledged Notes, except that the amount of insurance coverage need not exceed 100% of the replacement cost of the collateral.

6.12    No Setoffs or Counterclaims.  All payments hereunder and under the other Loan Documents made by or on behalf of Borrower shall be made without setoff or counterclaim and free and clear of, and without deduction or withholding for or on account of, any federal, state, or local taxes.

6.13    Compliance with Laws.  Borrower shall comply in all material respects with the requirements of all applicable laws, rules, regulations, and orders of any governmental authority having jurisdiction over Borrower or the Collateral.

7.    NEGATIVE COVENANTS.

Borrower covenants and agrees that, until full and final payment of the Obligations, Borrower will not do any of the following, without Alliance's prior written consent:

7.1    Indebtedness.    Create, incur, assume, permit, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)    Indebtedness evidenced by this Agreement or any note executed by Borrower in favor of Alliance relating to this Agreement or any other Loan Document;

(b)    Indebtedness secured by Permitted Liens.

7.2    Restrictions on Fundamental Changes.  Enter into any acquisition, merger, consolidation, reorganization, or recapitalization, or reclassify its membership interests, or liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

7.3    Change Name.  Change Borrower's name, FEIN, or identity, or add any new fictitious name, without Alliance's prior written consent, which shall not be unreasonably withheld.

7.4    Other Liens.  Create or permit to be created or allow to exist any lien on any Collateral now owned or hereafter, except Permitted Liens.

5958030v4/22359-0098

WAB0052

000004200200062-3_0q31_20200820170018.pdf  52                                                                                          5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

7.5     Guarantee.  Guarantee or otherwise become in any way liable with respect to the obligations of any third Person except by endorsement of instruments or items of payment for deposit to the account of Borrower or which are transmitted or turned over to Alliance.

7.6     Restructure.  Make any material change in Borrower's financial structure, the principal nature of business operations, or the date of its fiscal year.

7.7     Change of Control.  Cause, permit, or suffer, directly or indirectly, any Change of Control.

7.8     Distributions.  Make any distribution or declare or pay any fees to any of Borrower's members if an Event of Default has occurred and is continuing, or if and Event of Default shall occur upon giving effect to such distribution or payment.

7.9     Accounting Methods.  Modify or change its method of accounting.

7.10    Investments.  Directly or indirectly make any loan, advance, or capital contribution to, any member of Borrower except by written agreement in an arms length transaction to fund a Pledged Note, and further provided no Event of Default has occurred and is continuing, and no Event of Default shall occur upon giving effect to such loan, adavnce or capital contribution.

7.11    Suspension.  Suspend or go out of a substantial portion of its business.

7.12    Reserved.

8.      EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1     If Borrower fails to pay when due and payable any portion of the Obligations whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, wouldn't have accrued on such amounts);

8.2     If Borrower fails to pay within five (5) days after written notice from Alliance of a failure to pay any fees and charges due Alliance, reimbursement of Alliance Expenses;

8.3     If Borrower fails or neglects to perform, keep, or observe any term, provision, condition, covenant, or agreement contained in this Agreement, in any of the other Loan Documents, or in any other present or future agreement between Borrower and Alliance and such failure is not cured within ten (10) days after written notice thereof (provided, however, that if such failure cannot reasonably be cured within ten (10) days through the use of commercially reasonable and diligent efforts, then Borrower will have such additional time as is necessary to cure such failure through the use of commercially reasonable and diligent efforts, but in no event more than sixty (60) days following the date of the original written notice of such failure);

22

WAB0053

FILED DATE: 5/26/2021 3:38 PM 2017L006009

8.4    If any material portion of Borrower's properties or assets is attached, seized, subjected to a writ or distress warrant, or is levied upon;

8.5    If an Insolvency Proceeding is commenced against Borrower and any of the following events occur:    (a) Borrower consents to the institution of the Insolvency Proceeding against it; (b) the petition commencing the Insolvency Proceeding is not timely controverted; (c) the petition commencing the Insolvency Proceeding is not dismissed within ninety (90) calendar days after the date of the filing thereof; provided, however, that, during the pendency of such period, Alliance shall be relieved of its obligation to make additional advances; (d) an interim trustee is appointed to take possession of all or a substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, Borrower; or (e) an order for relief shall have been issued or entered therein;

8.6    If Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs and the same is not dismissed within thirty (30) days after entry of such order;

8.7    Except for Permitted Liens, if a notice of lien, levy, or assessment is filed of record with respect to any of Borrower's properties or assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, or if any taxes or debts owing at any time hereafter, to any one or more of such entities becomes a lien, whether choate or otherwise, upon any of Borrower's properties or assets and the same is not:    (i) paid on the later of the payment date thereof or ten (10) days following the date of the notice, or (ii) adequately bonded against and reserved for, in a manner acceptable to Alliance in its sole and absolute discretion;

8.8    If a judgment or other claim in excess of Two Hundred Thousand Dollars ($200,000.00) becomes a lien that is senior to the Note Mortgage or encumbrance upon any material portion of Borrower's properties or assets and the same is not paid on the payment date thereof or the applicable Pledged Notes or REO are not removed from the Borrowing Base, or if any judgment or other claim less than Two Hundred Thousand Dollars ($200,000.00) becomes a lien that is senior to the Note Mortgage or encumbrance upon any material portion of Borrower's properties or assets and the same is not adequately bonded against and reserved for in a manner acceptable to Alliance in its sole and absolute discretion or is the applicable Pledged Notes or REO are not removed from the Borrowing Base;

8.9    If any material misstatement or misrepresentation exists now or hereafter in any warranty, representation, statement, or report made to Alliance by Borrower or any officer or director of Borrower, or if any such warranty or representation is withdrawn; provided, however, if the representation breached is that set forth in Sections 5.1 through 5.7 and 5.16, Alliance shall not declare an Event of Default, but rather, to the extent that Alliance determines in its reasonable discretion that the Asset Value should be reduced the property which is the subject of such breach shall be backed out of the Borrowing Base to the extent of such reduction, and if such computation results in an overadvance, Borrower shall, within thirty (30) days following the delivery of written notice by Alliance, pay the same, or provide Alliance with a lien and security interest in additional collateral with a Borrowing Base sufficient to cure the applicable shortfall;

5958030v4/22359-0098

FILED DATE: 5/26/2021 3:38 PM  2017L006009

8.10    With respect to any Plan, the occurrence of any event which could reasonably be expected to have a material adverse effect on the financial condition of Borrower.

8.11    If Guarantor fails or neglects to perform, keep, or observe any term, provision, condition, covenant, or agreement contained in the Guaranty;

8.12    If Guarantor becomes the subject of an Insolvency Proceeding.

9.    ALLIANCE'S RIGHTS AND REMEDIES.

9.1    Rights and Remedies. In addition to the remedies set forth in the other Loan Documents, upon the occurrence and during the continuance of an Event of Default Alliance may, at its election, without additional notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

(b)    Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between Borrower and Alliance;

(c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Alliance, but without affecting Alliance's rights and security interests in the Collateral and without affecting the Obligations;

(d)    Without notice to or demand upon Borrower, make such payments and do such acts as Alliance considers necessary or reasonable to protect its security interests in the Collateral. Borrower authorizes Alliance to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in Alliance's determination appears to conflict with its security interests and to pay all expenses incurred in connection therewith;

(e)    Without notice to Borrower (such notice being expressly waived), and without constituting a retention of any Collateral in satisfaction of an obligation (within the meaning of Section 9505 of the Code), set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Alliance, or (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Alliance;

(f)    Hold, as cash collateral, any and all balances and deposits of Borrower held by Alliance to secure the full and final repayment of all of the Obligations;

(g)    Prepare for sale, advertise for sale, and sell the Collateral in accordance with the procedures set forth in Section 9.1(h). Alliance is hereby granted a license or other right to use, without charge, Borrower's labels, patents,

24

WAB0055

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 37 of 55

000004200200062-3_0q31_20200820170018.pdf  55                                    5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale, and selling any Collateral and Borrower's rights under all licenses and all franchise agreements shall inure to Alliance's benefit;

(h) Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Alliance determines is commercially reasonable. Any party, including Borrower, Guarantor, and any affiliate of Borrower or Guarantor, may bid at any such sale of any Collateral. It is not necessary that the Collateral be present at any such sale;

(i) Without regard to any waste, adequacy of the security or solvency of the Borrower, apply for the appointment of a receiver of the Collateral, to which appointment the Borrower hereby consents, whether or not foreclosure proceedings have been commenced under any security documents and whether or not a foreclosure sale has occurred.

9.2     Remedies Cumulative. Alliance's rights and remedies under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Alliance shall have all other rights and remedies as provided under the Code, by law, or in equity. No exercise by Alliance of one right or remedy shall be deemed an election, and no waiver by Alliance of any Event of Default shall be deemed a continuing waiver. No delay by Alliance shall constitute a waiver, election, or acquiescence by it.

9.3     Foreclosure Not A Discharge. Foreclosure shall not operate as a discharge to the indemnity provisions in Section 11 prior to the date they expire by their terms. The indemnity provisions in Section 11 shall not be discharged or affected in any way by foreclosure or by Alliance's acceptance of a deed in lieu thereof.

10.     TAXES AND EXPENSES REGARDING THE COLLATERAL.

If Borrower fails to pay, or cause the payment of, any monies, except for Permitted Liens, (whether taxes, rents, assessments, insurance premiums, or otherwise) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, or the other Loan Documents, then, to the extent that Alliance reasonably determines that such failure by Borrower could have a material adverse effect on Alliance's interests in any part of the Collateral, Alliance may do any or all of the following: (a) make payment of the same or any part thereof; (b) set up such reserves in Borrower's loan account as Alliance deems necessary to protect Alliance from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in Section 6.12, and take any action with respect to such policies as Alliance deems prudent. Any such amounts paid by Alliance shall constitute Alliance Expenses. Any such payments made by Alliance shall not constitute an agreement by Alliance to make similar payments in the future or a waiver by Alliance of any Event of Default under this Agreement. Alliance need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance, or lien and the

25

WAB0056

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 38 of 55

00004200200062-3_0q31_20200820170018.pdf  56                                    5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM  2017L006009

receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

     11.     **WAIVERS; INDEMNIFICATION.**

     11.1     Demand; Protest; etc. Each Borrower hereby absolutely, unconditionally, knowingly, and expressly waives

     (a)     Any act or event that might otherwise discharge, reduce, limit or modify its obligations under this Agreement or the other Loan Documents;

     (b)     All statutes of limitations as a defense to any action or proceeding brought against it or the Collateral by Alliance, to the fullest extent permitted by law;

     (c)     Any right it may have to require Alliance to proceed against any Borrower or Guarantor, proceed against or exhaust any security held for the Obligations, or pursue any other remedy in Alliance's power to pursue;

     (d)     Any defense based on any waiver, extension, modification, forbearance, delay or other act or omission of Alliance, or its failure to proceed promptly or otherwise as against any Borrower or Guarantor or any security for the Obligations;

     (e)     Any defense based on: (i) any legal disability of any Borrower or guarantor, (ii) any release, discharge, modification, impairment, or limitation of the liability of any Borrower or Guarantor to Alliance from any cause, whether consented to by Alliance or arising by operation of law or from any insolvency proceeding, in or out of court (iii) any rejection or disaffirmance of the Obligations, or any part of them, or any security held for the Obligations, in any such insolvency proceeding, or (iv) any claim that its obligations exceed or are more burdensome than those of any Borrower;

     (f)     Any defense based on any action taken or omitted by Alliance in any insolvency proceeding involving any Borrower or Guarantor , including any election to have Alliance's claim allowed as being secured, partially secured or unsecured, any extension of credit by Alliance in any insolvency proceeding, and the taking and holding by Alliance of any security for any such extension of credit;

     (g)     Any defense based upon any action, omission, or circumstance that might increase the likelihood that any Collateral pledged by it may be foreclosed upon by Alliance or that might affect the rights or remedies of it as against Borrowers or any Borrower;

     (h)     Any defense based upon any dealings occurring at any time, whether relating to the Obligations or otherwise;

     (i)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of acceptance and of the existence, creation, or incurring of new or additional indebtedness of Borrowers, or any of them, and demands and notices of every kind, except for any demand or notice by Alliance to it expressly provided for in this Agreement or the other Loan Documents;

26

WAB0057

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 39 of 55

00004200200062-3_0q31_20200820170018.pdf 57                                                5/25/2021 9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM  2017L006009

(j)     Any defense based on or airing out of any defense that a Borrower or Guarantor may have to the payment or performance of the Obligations or any part of them;

(k)     All rights of subrogation, reimbursement, indemnification, contribution, and any other rights to collect reimbursement for any sums paid to Alliance, whether contractual or arising by operation of law (including the United States Bankruptcy Code or any successor or similar statute), or otherwise, all rights to enforce any remedy that Alliance may have against any Borrower or Guarantor and all rights to participate in any security now or later to be held by Alliance for the Obligations;

(l)     Any benefit of the provisions of Arizona Revised Statutes Sections 12-1641 and 12-1642 et seq., or any successor or similar statute, and Rule 17(f) of the Arizona Rules of Civil Procedures, to the extent applicable, or any successor or similar rule; and

(m)     Any right to require Alliance to proceed against Guarantor, to proceed against or exhaust any other security for the Obligations, to pursue any other remedy available to Alliance, or to pursue any remedy in any particular order or manner; (ii) the benefits of any legal or equitable doctrine or principle of marshalling; (iii) the benefits of any statute of limitations affecting the enforcement hereof;  and (iv) any benefit of, and any right to participate in, any other security now or hereafter held by Alliance.

11.2    Subrogation.    Until full and final repayment of any of the Obligations, each Borrower hereby absolutely, unconditionally, knowingly, and expressly waives: (i) any right of subrogation it has or may have as against the others with respect to the Obligations; (ii) any right to proceed against the others or any other person or entity, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which it may now have or hereafter have as against the others with respect to the Obligations; and (iii) any right to proceed or seek recourse against or with respect to any property or asset of the others.

11.3    Other Security. The acceptance of this Agreement by Alliance shall not be considered a waiver of or in any way to affect or impair any other security that Alliance may have, acquire simultaneously herewith, or hereafter acquire for the payment or performance of the Obligations, nor shall the taking by Alliance at any time of any such additional security be construed as a waiver of or in any way to affect or impair Alliance's security interest in the collateral.  Alliance may resort, for the payment or performance of the Obligations, to its several securities therefor in such order and manner as it may determine.

11.4    Alliance's Liability for Collateral. So long as Alliance complies with its obligations, if any, under Section 9207 of the Code, prior to the date Alliance takes control of the Collateral, Alliance shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral, prior to the date Alliance takes control of the Collateral, shall be

FILED DATE: 5/26/2021 3:38 PM    2017L006009

borne by Borrower. No risk of loss, damage, or destruction of the Collateral, after to the date Alliance takes control of the Collateral, shall be borne by Borrower.

11.5    Indemnification. Borrower agrees to defend, indemnify, save, and hold harmless all Indemnified Persons for, from and against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other Person arising out of or relating to the transactions contemplated by this Agreement or any other Loan Document including, but not limited to, those claimed by any broker or finder, and (b) all Losses, and (c) all losses (including resonable attorneys' fees) suffered or incurred by any Indemnified Person, whether as a holder of security interests in Collateral, as mortgagee in possession, or as successor in interest to Borrower as owner of any Collateral by virtue of foreclosure or acceptance of a deed or other transaction in lieu of foreclosure, or after partial or total reconveyance of the mortgage, arising from, in respect of, as a consequence of (whether foreseeable or unforeseeable) or in connection with the use, storage, disposal, generation, transportation, spill or treatment of any Hazardous Materials at or related to any Collateral whether or not originating or emanating from Collateral. This provision shall survive the termination of this Agreement. Notwithstanding the foregoing, Borrower shall not be required to indemnify and hold harmless any Indemnified Persons against Losses or claims arising from such Indemnified Person's gross negligence, intentional misconduct or violation of law, regulation, ordinance, code, decree or order.

12.    NOTICES.

Unless otherwise provided in this Agreement, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, (d) transmitted by facsimile, or sent as email, in each case delivered or sent to the party to whom notice is being given to the business address, facsimile number, or email address set forth below as to each party, at such other business address, facsimile number, or email address as it may hereafter designate in writing to the other party pursuant to the terms of this Section.  All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (a) the date received if personally delivered, (b) two business days after deposit in the mail if delivered by mail, (c) the date delivered to the courier if delivered by overnight courier, or (d) the date of transmission if sent by facsimile or by email, provided that confirmation of delivery is received for any facsimile or email notice and further provided that immediately following any email or facsimile notice additional notice shall be sent in any other manner authorized hereunder to supplement the facsimile or email notice.

If to Borrower:        Red Rock River LLC
                       2915 East Baseline Road, Suite 109
                       Gilbert, AZ 85234
                       Attn: Patrick Cardon
                       Email: pcardon@windowrock.com

                       Home Opportunity LLC
                       2915 East Baseline Road, Suite 109
                       Gilbert, AZ 85234

28

WAB0059

Case 2:21-bk-04924-EPB    Doc 18-9    Filed 07/23/21    Entered 07/23/21 14:04:55    Desc
Exhibit I    Page 41 of 55

00004200200062-3_0q31_20200820170018.pdf  59                                              5/25/2021 9:00:19 PM

Attn: Patrick Cardon
Email: pcardon@windowrock.com

With a copy to:    Bryan Cave
Two North Central Avenue, Suite 2200
Phoenix, AZ 85004-4406
Attn: Quinn Wheeler, Esq.
Facsimile No.: (602) 716-8027
Email: quinn.wheeler@bryancave.com

If to Alliance:    Western Alliance Bank
3033 West Ray Road
Chandler, Arizona 85226
Attn: Seth N. Davis, Senior Vice President
Facsimile No.: (602) 797-0386
Email: sdavis@alliancebankofarizona.com

With a copy to:    Gallagher & Kennedy, P.A.
2575 East Camelback Road, #1100
Phoenix, Arizona 85016
Attn: Julie Rystad, Esq.
Facsimile No.: (602) 530-8000
Email: julie.rystad@gknet.com

The failure of a party to provide notice to either law firm shall not affect the validity of any notice otherwise properly sent to the other party.

13.    GOVERNING LAW; CONSENT TO JURISDICTION.

(a)    Substantial Relationship. The parties understand and agree that the payment obligations of Borrower are to be performed in the State of Arizona, which state the parties agree has a substantial relationship to the parties and to the underlying transactions embodied by this Agreement and the Loan Documents.

(b)    GOVERNING LAW; JURISDICTION. THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS HAS BEEN DELIVERED IN ARIZONA, AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ARIZONA, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES. THE COURTS OF ARIZONA, FEDERAL OR STATE, SHALL HAVE EXCLUSIVE JURISDICTION OF ALL LEGAL ACTIONS ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS. BY EXECUTING THIS AGREEMENT, BORROWER CONSENTS AND SUBMITS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS OF ARIZONA.

5958030v4/22359-0098

FILED DATE: 5/26/2021 3:38 PM 2017L006009

14.    Waiver Of Jury Trial And Certain Damage Claims.    BORROWER AND ALLIANCE AND ANY OTHER PARTY LIABLE FOR BORROWER'S OBLIGATIONS EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS (WHETHER SUCH CASE OR CONTROVERSY IS INITIATED BY OR AGAINST ALLIANCE OR IN WHICH ALLIANCE IS JOINED AS A PARTY LITIGANT), WHICH CASE OR CONTROVERSY ARISES OUT OF, OR IS IN RESPECT TO, ANY RELATIONSHIP AMONGST OR BETWEEN BORROWER, ANY SUCH PERSON, AND ALLIANCE.    EXCEPT TO THE EXTENT EXPRESSLY PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION REFERRED TO IN THE PRECEDING SENTENCE ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.    BORROWER (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ALLIANCE HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ALLIANCE WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (B) ACKNOWLEDGES THAT ALLIANCE HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS CONTAINED HEREIN. BORROWER MAKES THE FOREGOING WAIVER (IN WHICH ALLIANCE JOINS) KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY, AND UNDERSTANDS THAT ALLIANCE, IN THE ESTABLISHMENT AND MAINTENANCE OF ITS RELATIONSHIP WITH BORROWER, IS RELYING THEREON.

15.    GENERAL PROVISIONS.

15.1    Effectiveness. This Agreement shall be binding and deemed effective when executed by Borrower and Alliance.

15.2    Successors and Assigns. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Alliance's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Alliance shall release Borrower from its Obligations.  Alliance may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment.  Alliance reserves the right to sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in Alliance's rights and benefits hereunder.  In connection with any such assignment or participation, Alliance may disclose all documents and information which Alliance now or hereafter may have relating to Borrower or Borrower's business, subject to any confidentiality agreements or provisions in the Loan Documents.  To the extent that Alliance assigns its rights and obligations hereunder to a third Person, Alliance shall thereafter be released from such assigned obligations to Borrower beginning on the date of the assignment.

FILED DATE: 5/26/2021 3:38 PM    2017L006009

15.3    Section Headings. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Agreement.

15.4    Interpretation. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Alliance or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

15.5    Severability of Provisions. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

15.6    Amendments in Writing. This Agreement cannot be changed or terminated orally. All prior agreements, understandings, representations, warranties, and negotiations, if any, are merged into this Agreement.

15.7    Counterparts; Executed Copies. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Email or facsimile copies of signatures shall be as effective as original executed counterparts of this Agreement.

15.8    Revival and Reinstatement of Obligations. If the incurrence or payment of the Obligations by Borrower or Guarantor of the Obligations or the transfer by either or both of such parties to Alliance of any property of either or both of such parties should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, and other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if Alliance is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Alliance is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of Alliance related thereto, the liability of Borrower and Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

15.9    Lending Relationship. Nothing contained in the this Agreement or any of the other Loan Documents shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Borrower and Alliance, it being expressly understood and agreed that nothing contained in this Agreement or the other Loan Documents shall be deemed to create any relationship between Borrower and Alliance other that the relationship of borrower and lender.

15.10    Integration. This Agreement, the exhibits attached hereto and the other Loan Documents contain the entire agreement and understanding of the parties with respect to the subject matter hereof, supersede all other prior understandings, oral or written, with respect

5958030v4/22359-0098

FILED DATE: 5/26/2021 3:38 PM  2017L006009

to the subject matter hereof, and are intended by Alliance and Borrower as the final, complete and exclusive statement of the terms agreed to by them.

15.11  Joint and Several Liability. Each of the Borrowers shall be jointly and severally liable hereunder with respect to all Obligations regardless of which of the Borrowers actually receives the proceeds of the Loans or the benefit of any other extensions of credit hereunder, or the manner in which any Borrower or Alliance account therefor in their respective books and records.

[Signature page follows]

32

5958030v4/22359-0098

WAB0063

00004200200062-3_0q31_20200820170018.pdf  63                                                      5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM 2017L006009

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in Phoenix, Arizona.

BORROWER:

RED ROCK RIVER LLC, a Delaware limited liability company

By: Window Rock Manager, LLC, a Delaware limited liability company
Its: Manager

By: _____
Patrick Cardon
Its: Authorized Officer

HOME OPPORTUNITY LLC, a Delaware limited liability company

By: Red Rock River LLC, a Delaware limited liability company
Its: Manager

By: _____
Patrick Cardon
Its: Authorized Officer

ALLIANCE:

WESTERN ALLIANCE BANK, an Arizona corporation

By: _____
Name: Seth N. Davis
Title: Senior Vice President

[Signature Page to Loan and Security Agreement]

WAB0064

00004200200062-3_0q31_20200820170018.pdf  64

5/25/2021  9:00:19 PM

FILED DATE: 5/26/2021 3:38 PM   2017L006009

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in Phoenix, Arizona.

BORROWER:

RED ROCK RIVER LLC, a Delaware limited liability company

By: Window Rock Manager, LLC, a Delaware limited liability company
Its:  Manager

By:_____
    Patrick Cardon
    Its: Authorized Officer

HOME OPPORTUNITY LLC, a Delaware limited liability company

By: Red Rock River LLC, a Delaware limited liability company
Its:  Manager

By:_____
    Patrick Cardon
    Its: Authorized Officer

ALLIANCE:

WESTERN ALLIANCE BANK, an Arizona corporation

By: _____
Name:   Seth N. Davis
Title:  Senior Vice President

[Signature Page to Loan and Security Agreement]

WAB0065

00004200200062-3_0q31_20200820170018.pdf  65

Loan Officer

As of: Frequency

462636890 **Red Rock River, LLC**

09/30/2017 Quarterly

Minimum Balance Required: **$1,000,000.00**

Total Deposits: $10,159,136.49

Minimum Requirement Met: Yes

| Account | Amount |
| --- | --- |
| 3155 | $0.00 |
| 9527 | $1.75 |
| 8305 | $1,653.49 |
| 8009 | $2,768.42 |
| 9749 | $12,806.22 |
| 4234 | $17,927.97 |
| 4116 | $21,483.31 |
| 5558 | $31,616.93 |
| 9812 | $56,422.80 |
| 7543 | $57,356.08 |
| 4225 | $92,555.38 |
| 4123 | $159,178.93 |
| 3574 | $219,709.17 |
| 2888 | $352,136.86 |
| 3135 | $545,215.20 |
| 1105 | $610,588.26 |
| 1688 | $624,991.17 |
| 2657 | $1,238,101.96 |
| 8183 | $2,810,732.95 |
| 6856 | $3,303,889.64 |

FILED DATE: 5/26/2021 3:38 PM   2017L006009

5/25/2021   906:230 PM

# Alliance Bank
## OF ARIZONA

Alliance Bank of Arizona, a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

WINDOW ROCK INVESTMENT OPERATIONS LLC
1819 E SOUTHERN AVE STE B10
MESA AZ 85204-5219

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

*THANK YOU FOR BANKING WITH US!*

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX2657 | Beginning balance | $749,535.69 |
| Enclosures | 9 | Total additions | 352,664.23 |
| Low balance | $48,633.44 | Total subtractions | 1,053,566.48 |
| Average balance | $528,404.70 | Ending balance | $48,633.44 |
| Avg collected balance | $528,318 | | |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 395 | 03-04 | 50.00 | 400 | 03-19 | 800.00 |
| 396 | 03-10 | 508.75 | 401 | 03-22 | 8,644.83 |
| 397 | 03-10 | 6,507.68 | 402 | 03-17 | 66.68 |
| 398 | 03-22 | 265.00 | 403 | 03-18 | 105.00 |
| 399 | 03-23 | 50.00 | | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-22 | ' Wire Dr O/L Usd | 1,000,000.00 |
| | OUTGOING WIRE BNF WINDOW ROCK CREDIT OPPORTUNITY F | |
| | UND;REF ;WIRE/OUT - 20210810527600 | |
| 03-23 | ' Analysis Results Chg | 796.48 |
| | ANALYSIS CHARGES FOR 02/21 | |
| 03-23 | ' Fee Based Charge | 35.00 |
| | FEE BASED CHARGES FOR 02/21 | |

FILED DATE: 5/26/2021 3:38 PM   2017L006009

# Alliance Bank
## OF ARIZONA

Alliance Bank of Arizona, a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

DIBS US INC
1819 E SOUTHERN AVE SUITE B10
MESA AZ 85204-5219

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

***THANK YOU FOR BANKING WITH US!***

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX3135 | Beginning balance | $31,385.64 |
| Enclosures | 2 | Total additions | .00 |
| Low balance | $31,125.39 | Total subtractions | 260.25 |
| Average balance | $31,275.67 | Ending balance | $31,125.39 |
| Avg collected balance | $31,275 | | |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 332 | 03-02 | 57.47 | 333 | 03-23 | 50.00 |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-23 | ' Analysis Results Chg | 82.78 |
| | ANALYSIS CHARGES FOR 02/21 | |
| 03-25 | ' Online Transfer Dr | 70.00 |
| | REF 0841723L FUNDS TRANSFER TO DEP XXXXXX7543 | |
| | FROM 02 08 AMEX MM | |

### DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02-28 | 31,385.64 | 03-23 | 31,195.39 | | |
| 03-02 | 31,328.17 | 03-25 | 31,125.39 | | |

FILED DATE: 5/26/2021 3:38 PM  2017L006009

# Alliance Bank
## OF ARIZONA

Alliance Bank of Arizona, a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

WINDOW ROCK CAPITAL PARTNERS LLC
1819 E SOUTHERN AVE STE B10
MESA AZ 85204-5219

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

---

***THANK YOU FOR BANKING WITH US!***

---

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX7543 | Beginning balance | $632.08 |
| Low balance | $-17,888.48 | Total additions | 60,778.76 |
| Average balance | $1,311.72 | Total subtractions | 37,847.05 |
| Avg collected balance | $1,311 | Ending balance | $23,563.79 |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 1058 | 03-02 | 70.00 | 1060 | 03-10 | 41.25 |
| 1059 | 03-05 | 234.94 | | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-01 | ' ACH Debit | 50.30 |
| | TOWN OF GILBERT BILLPAY 210301 | |
| 03-02 | ' ACH Debit | 57.73 |
| | SRP SUREPAY-S1 210302 | |
| 03-02 | ' ACH Debit | 88.18 |
| | SRP SUREPAY-S1 210302 | |
| 03-02 | ' ACH Debit | 18,254.35 |
| | AMEX EPAYMENT ACH PMT 210302 | |
| | W8214 | |
| 03-03 | ' Online Transfer Dr | 1,500.00 |
| | REF 0621544L FUNDS TRANSFER TO DEP XXXXXX1688 | |
| | FROM MM WRCP TO CADI TO REDUCE DTDF | |

FILED DATE: 5/26/2021 3:38 PM   2017L006009

# Alliance Bank
### OF ARIZONA

Alliance Bank of Arizona, a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

CADI US LLC
1819 E SOUTHERN AVE SUITE B10
MESA AZ 85204-5219

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

---

*THANK YOU FOR BANKING WITH US!*

---

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX1688 | Beginning balance | $144,784.87 |
| Low balance | $144,784.87 | Total additions | 55,716.06 |
| Average balance | $174,185.55 | Total subtractions | .00 |
| Avg collected balance | $174,185 | Ending balance | $200,500.93 |

### CREDITS

| Date | Description | Additions |
|---|---|---|
| 03-03 | ' Online Transfer Cr<br>REF 0621544L FUNDS TRANSFER FRMDEP XXXXXX7543<br>FROM MM WRCP TO CADI TO REDUCE DTDF | 1,500.00 |
| 03-12 | ' Online Transfer Cr<br>REF 0711114L FUNDS TRANSFER FRMDEP XXXXXX7543<br>FROM RDUCE WRCP TO CADI DTDF | 2,700.00 |
| 03-12 | ' Wire Cr-Usd<br>INCOMING WIRE ORG SERVIS ONE INC;REF ;WIRE/IN - 20<br>210710973300 | 36,716.06 |
| 03-25 | ' Online Transfer Cr<br>REF 0841723L FUNDS TRANSFER FRMDEP XXXXXX7543<br>FROM PARTIALLY REDUCE WRCP TO CADI DTDF | 8,800.00 |
| 03-29 | ' Online Transfer Cr<br>REF 0881252L FUNDS TRANSFER FRMDEP XXXXXX7543<br>FROM PARTIALLY REDUCES WRCP TO CADI DTDF | 6,000.00 |

FILED DATE: 5/26/2021 3:38 PM  2017L006009



# Alliance Bank

**OF ARIZONA**

Alliance Bank of Arizona. a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

Last statement: February 28, 2021
This statement: March 31, 2021
Total days in statement period: 31

WRCOF ASSET TRUST 2017-1
(COLLECTION ACCOUNT) FBO CREDIT SUISSE
FIRST BOSTON MORTGAGE CAPITAL LLC
AS SECURED PARTY
1819 E SOUTHERN AVE STE B10
MESA AZ 85204-5219

Page 1 of 2
XXXXXX8183
( 0)

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

*THANK YOU FOR BANKING WITH US!*

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX8183 | Beginning balance | $533,304.63 |
| Low balance | $152,293.06 | Total additions | 541,000.00 |
| Average balance | $426,256.64 | Total subtractions | 381,411.57 |
| Avg collected balance | $426,256 | Ending balance | $692,893.06 |

### CHECKS

| Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|
| 257 | 03-03 | 9,490.00 | 260 | 03-17 | 133.32 |
| 259 * | 03-04 | 150.00 | * Skip in check sequence | | |

### DEBITS

| Date | Description | Subtractions |
|---|---|---|
| 03-11 | ' Online Transfer Dr | 21,049.76 |
| | REF 0701043L FUNDS TRANSFER TO DEP XXXXXX9749 | |
| | FROM PR 03152021 | |
| 03-22 | ' Online Transfer Dr | 350,000.00 |
| | REF 0811311L FUNDS TRANSFER TO DEP XXXXXX2657 | |
| | FROM MM WTR1 TO WRIO FOR COPP | |
| 03-24 | ' Wire Dr O/L Usd | 138.50 |
| | OUTGOING WIRE BNF BSI FINANCIAL SERVICES;REF ;WIRE | |
| | /OUT - 20210830384000 | |
| 03-25 | ' Online Transfer Dr | 49.99 |
| | REF 0841723L FUNDS TRANSFER TO DEP XXXXXX7543 | |
| | FROM 02 08 AMEX MM | |

FILED DATE: 5/26/2021 3:38 PM    2017L006009



**Alliance Bank** OF ARIZONA

Alliance Bank of Arizona. a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

CREDIT OPPORTUNITY HOLDINGS LLC
1819 E SOUTHERN AVE STE B10
MESA AZ 85204-5219

Last statement: February 28, 2021
This statement: March 31, 2021
Total days in statement period: 31

Page 1 of 1
XXXXXX3155
( 0)

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

*THANK YOU FOR BANKING WITH US!*

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX3155 | Beginning balance | $6,834.12 |
| Low balance | $6,834.12 | Total additions | .00 |
| Average balance | $6,834.12 | Total subtractions | .00 |
| Avg collected balance | $6,834 | Ending balance | $6,834.12 |

**\*\* No activity this statement period \*\***

OVERDRAFT/RETURN ITEM FEES

| | Total for this period | Total year-to-date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

*Thank you for banking with Alliance Bank Of Arizona*

FILED DATE: 5/26/2021 3:38 PM  2017L006009



Alliance Bank of Arizona, a division of Western Alliance Bank.
Member FDIC.

PO Box 26237 • Las Vegas, NV 89126-0237
**Return Service Requested**

WINDOW ROCK MANAGER LLC
1819 E SOUTHERN AVE STE B10
MESA AZ 85204-5219

Last statement: February 28, 2021
This statement: March 31, 2021
Total days in statement period: 31

Page 1 of 2
XXXXXX9749
( 0)

Direct inquiries to:
877-273-2265

Alliance Bank Of Arizona
3033 West Ray Road
Chandler AZ 85226

*THANK YOU FOR BANKING WITH US!*

## Analyzed Business Checking

| | | | |
|---|---|---|---|
| Account number | XXXXXX9749 | Beginning balance | $2,724.37 |
| Low balance | $2,724.37 | Total additions | 42,636.58 |
| Average balance | $2,724.37 | Total subtractions | 42,636.58 |
| Avg collected balance | $2,724 | Ending balance | $2,724.37 |

**DEBITS**

| Date | Description | Subtractions |
|---|---|---|
| 03-11 | ' Online Transfer Dr | 21,049.76 |
| | REF 0701043L FUNDS TRANSFER TO DEP XXXXXX9254 FROM | |
| 03-31 | ' Online Transfer Dr | 21,586.82 |
| | REF 0901246L FUNDS TRANSFER TO DEP XXXXXX9254 FROM | |

**CREDITS**

| Date | Description | Additions |
|---|---|---|
| 03-11 | ' Online Transfer Cr | 21,049.76 |
| | REF 0701043L FUNDS TRANSFER FRMDEP XXXXXX8183 FROM PR 03152021 | |
| 03-31 | ' Online Transfer Cr | 21,586.82 |
| | REF 0901245L FUNDS TRANSFER FRMDEP XXXXXX2657 FROM | |

FILED DATE: 5/26/2021 3:38 PM   2017L006009