John C. Kelly (012770)
Marvin C. Ruth (024220)
Katherine L. Hyde (025441)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 224-0999
F: (602) 224-6020
jkelly@cblawyers.com
mruth@cblawyers.com
khyde@cblawyers.com
*Attorneys for Applicants*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>HOME OPPORTUNITY, LLC,<br><br>Debtor. | Chapter: 7<br><br>Case No. 2:21-bk-04924-EPB<br><br>**REPLY IN SUPPORT OF APPLICATION TO CONFIRM ABSENCE OF AUTOMATIC STAY WITH RESPECT TO DEPOSIT ACCOUNTS HELD SOLELY BY APPLICANTS AT WESTERN ALLIANCE BANK** |
| WINDOW ROCK INVESTMENT OPERATIONS, LLC, a Delaware corporation; DIBS US, INC., a Delaware corporation; CADI US, LLC, a Delaware limited liability company; WRCOF ASSET TRUST 2017-1, a Delaware statutory trust; and CREDIT OPPORTUNITY HOLDINGS, LLC, a Delaware limited liability company,<br><br>Applicants,<br><br>v.<br><br>HOME OPPORTUNITY, LLC, Debtor; CHAPTER 7 TRUSTEE, ROBERT A. MACKENZIE,<br><br>Respondents. | |

{00567705.2 }

1       In its Objection [DE 41] to the Application to Confirm Absence of the Automatic Stay with Respect Deposit Accounts Held Solely by Applicants at Western Alliance Bank (the "Application") [DE 17], the Ware Estate's counsel repeatedly mischaracterizes the facts and the law in a misguided attempt to maintain a de facto injunction over the third-party non-debtor Applicants and their operating bank accounts. Because neither the Objection, nor the Trustee's minimal Joinder [DE 42], provide any plausible basis to conclude that the WR Accounts, solely held by the Applicant WR Entities, are somehow property of the estate, the Court should grant the Application and confirm the absence of the automatic stay.

## INTRODUCTION/SUMMARY

      Armed with a judgment against the Debtor (but not against any of the WR Entities), the Ware Estate is nevertheless attempting to make the WR Entities responsible for paying on that judgment. The Ware Estate first filed a motion in the Illinois State Court, seeking an Order compelling the Bank to turn over the WR Accounts to it, based upon the false representation that the "[Debtor] pledged [the WR Entities'] bank accounts at [Bank] as collateral to secure an $8 million loan, [and] execut[ed] documents evincing its ownership of those accounts." [Ex. I to Cardon Decl. attached to Application as Ex. 1] The Ware Estate then served that Motion upon the Bank, causing the Bank to freeze the WR Accounts and creating this dispute.

      But – as was pointed out in the Application, Debtor did nothing of the sort. The Bank's loan documents (upon which Ware's counsel based this legal theory) make it crystal-clear only the borrower's property (this Debtor), and no other entity's property, was pledged as collateral for the loan. The WR Bank Accounts and the funds at issue are not the Debtor's and do not belong to the Debtor.

      The Ware Estate now appears to have abandoned this mischaracterization of the loan documents (although it has yet to correct the record with either the Illinois Court or the Bank) in favor a new, fabricated theory: that the Debtor admitted in the Loan Agreement it had the "power to direct the management and policies" of the separately organized WR Entities and

thus "possessed the ability to control the WR Accounts in question." [Obj. at 2, 12] This theory, like the prior one, lacks factual or legal support. The Debtor does not control any of the WR Entities or the WR Accounts, and once again, nothing in the Loan Agreement suggests otherwise.

The Ware Estate's sole "basis" for this latest theory (Obj. at ¶ 6-9) rests on a single provision in the Loan Agreement that provides Debtor with a lower interest rate on its loan from the Bank if the Debtor and its "affiliates" maintain a certain balance on deposit at the Bank. The WR Entities do not deny, as is set forth in the Declaration, that they and the Debtor have a common management relationship through Window Rock Manager, LLC ("WRM"). [Cardon Decl. at ¶¶ 1-10][1] But having a common manager does not, as Ware implies, make one entity an alter ego of another and Ware provides no case law in support of this position. [2] Nor does the fact that the manager, in its discretion, has caused separately organized entities to open separate deposit accounts at the Bank. There is no factual allegation (nor could there be) that funds have been commingled, or that the WR Entities were formed or the WR Accounts were opened to try to perpetrate some sort of fraud or injustice (which would be required to pierce the veil and attach those accounts).

---

[1] The WR Entities consist of WRIO, COH, DIBS, CADI, and WAT2017-1. WRM is the manager of WRIO. COH is the wholly-owned subsidiary of WRIO. WAT2017-1 is the wholly-owned subsidiary of COH. WRCP is the member of WRM, and the director of DIBS. *Id.*

[2] To satisfy the alter ego test, a plaintiff must make out a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Unocal*, 248 F.3d at 926 (alterations in original) (quoting *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996)). The "unity of interest and ownership" prong of this test requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Id*. (internal quotation marks omitted). This test envisions pervasive control over the subsidiary, such as when a parent corporation "dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." Id. (internal quotation marks omitted). Total ownership and shared management personnel are alone insufficient to establish the requisite level of control. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003).

Further, despite the repeated avowals by the Ware Estate that the Debtor purportedly "admitted" its control of the WR Accounts and Entities in the Loan Agreement, it simultaneously admits that it has *no evidence* to support those avowals and thus requests leave pursuant to Rule 56(d) to seek "evidence regarding debtor's control over the WR Entities and the WR Accounts," evidence as to "whether…the debtor possessed the ability to dictate the balances of the WR Accounts," and "communications by and between the debtor, the Applicants, and [the Bank]." [Obj. at Ex. C] But "courts need not condone the use of discovery to engage in fishing expeditions." *Rivera v. NIBCO*, 364 F.3d 1057, 1072 (9th Cir. 2004). The Court need look no further than the plain language of the Loan Agreement that the Ware Estate mischaracterized to the Illinois State Court and the Bank without opposition (until now). That Agreement simply does not state that by taking advantage of a lower interest rate by opening separate bank accounts and depositing their funds in those separate bank accounts at the same Bank as that used by Debtor, the WR Entities have somehow lost ownership or control of those funds. The requested discovery has no bearing on that plain language and does not support any cognizable legal theory.

Next, the Ware Estate asks that the WR Entities remain enjoined from accessing the WR Accounts because it "surmises" (its words, at ¶ 13)[3] that the Debtor may have diverted assets to the WR Entities. It again suggests that it needs Rule 56(d) relief to access "evidence" that is "solely and exclusively in the possession and/or control of the WR Entities." [Obj. at Ex. C, ¶ 7]. In short, the Ware Estate has acknowledged that it has no evidence to support this surmisal either.

The Debtor is a real estate investment fund. It receives money from a pool of investors and returns money to those investors. That is its business. Given the fact that the WR Entities are not owners, managers, or investors in Debtor, the Ware Estate is merely

---

[3] *See* https://www.merriam-webster.com/dictionary/surmise ("surmise" is "a thought or idea based on scanty evidence").

{00567705.2}   3

speculating that the Debtor received money from investors, and then, instead of investing it or returning it, transferred those monies to a different fund - or funds – owned and operated by the WR Entities. Nothing could be further from the truth. It should be noted that neither the Debtor itself – nor the Trustee – has made any such claim. If the Trustee, who joined in the objection [DE 42] without providing any additional argument, believes that funds were transferred or commingled between entities, he would and should have said so. Debtor's financial activity, which is captured in the general ledger of its sole member, Red Rock River, is available to the Trustee, and he cannot delegate the duty to conduct an investigation to the Ware Estate, while concurrently forcing the WR Entities to sit by without access to their own money.

Finally, that ongoing lack of access is harming not only the WR Entities, but other unrelated third parties. As further set forth below, Applicant CADI, for example, is currently holding more than $880,000 in its bank account for Servis One, Inc. dba BSI Financial Services ("Servis"), funds that can be easily and immediately traced to Servis, as a refundable deposit that it will be obligated to return. There is no basis to force the WR Entities, Servis, or other third parties to forgo their rights to their own property, in order for the Ware Estate to chase legal theories belied by the plain language of the operative documents, and contrary to the law. *See* Supplemental Cardon Decl. attached as Exh. 1.

## ARGUMENT

### I. Debtor does not control the WR Entities or the WR Accounts.

The Ware Estate's entire objection is premised on a singular falsehood: that the Debtor has the ability to control the WR Entities and thus the WR Accounts, as purportedly set forth in a Loan Agreement between Debtor and the Bank. The Ware estate incorrectly asserts (at 2) that this a "fact…beyond dispute," then proceeds to build his entire case on that groundless assertion. Its reading of the Loan Agreement, however, is flat wrong, ignores critical language, and ignores standard business practice.

1    The Loan Agreement provided the Debtor with a lower interest rate on the loan if the "[Debtor's] and its affiliates combined average unrestricted aggregate deposit account balances with [the Bank]" remained above $1.0 million. [Ex. A to Cardon Decl. at § 6.4] As used in Section 6.4, the term "affiliate" is not a defined term – and thus could mean just about anything – including a company that has the same manager as the Debtor, or even an individual who worked with the Debtor. But even if that term was intended to be a defined term, that Section still does not support the assertion offered by the Ware Estate.

The Loan Agreement defines "Affiliate" to mean "as applied to [the Debtor], any other Person directly or *indirectly* Controlling, Controlled by, *or under common Control with*, [the Debtor]." [*Id.* at § 1] (emphasis added). The Ware Estate, however, skips right over the provision regarding "common Control," and ignores that the WR Entities and the Debtor are, at best, subject to common control in the form of their manager, WRM. Instead, it leaps directly to the conclusion that there can be only one interpretation of that provision: that the WR Entities were "Affiliates" controlled by the Debtor. In essence, it concludes that an interest rate incentive shared by related business entities subjects all of those entities to the exclusive control of one of them (the Debtor), making their assets (in this case bank accounts) the property of just one of them.

That conclusion ignores basic corporate formalities and the evidence. As set forth in the Cardon Declaration, the WR Entities are separately organized, and at most, are under "common Control with" the Debtor through WRM. Each WR Account was set up by each individual WR Entity. The Debtor is not an owner or a signatory to any of the WR Accounts. The accounts were all established at the same bank to take advantage of an interest rate incentive. To conclude, from those facts, that the WR Entities had no true separate existence, did not have their own separate funds, and were subject to the Debtor's control, is specious.

Further, the fact that the WR Entities are affiliates of the Debtor means nothing. It is well recognized that the assets of an affiliated, related company do not become part of a debtor's bankruptcy estate, absent a prima facie showing that the companies are alter egos of each other, or otherwise subject to the complete "control" of the debtor. The Ware Estate has made no such showing. "The general rule is that corporate formalities remain in place during a bankruptcy proceeding such that any related company's assets remain separate and do not become part of the debtor company's bankruptcy estate." *Kayne v. Ho*, 2012 WL 12878753 (C.D.Cal. Sept. 6, 2012); *Movitz v. Todd*, 24 Fed. Appx. 707, 709 (9th Cir. 2001) (debtor shareholder had no ownership of the property of the non-debtor corporation in which the debtor shareholder held shares). To hold otherwise would force debtors to consolidate their assets with all of the assets held by its non-debtor parent, subsidiary, or other related companies – in effect, making the assets of St. Peter liable for the acts of St. Paul – and, in the process, defeating the entire purpose of separate incorporation and governance. That is not the law, notwithstanding the Ware Estate's mischaracterization of the Loan Agreement, to which the WR Entities are not even parties.[4]

---

[4] The Ware Estate asserts (at ¶ 18) that "a debtor's ability to control property is *determinative* of whether it should be included in its estate." (emphasis added) But the Estate misreads the cited cases, which are inapposite in any event. First, those merely provide that "control" is "applicable" or "relates to" determination of ownership. *See id.* citing *In re Rawlinson*, 209 B.R. 501, 507 (B.A.P. 9th Cir.1997) ("control is a concept *applicable* to the determination of whether an asset belongs to the estate") (emphasis added) and *In re Cilek*, 115 B.R. 974, 987 (Bankr. W.D. Wis. 1990) ("control *relates* to the ownership of assets") (emphasis added). Second, both *Rawlinson* and *Cilek* concern whether a debtor's "control" of an IRA affects the validity of the claimed exemption. *See Cilek*, 115 B.R. at 986 ("debtor's control of a claimed exemption is not a factor in determining the validity or extent of an exemption. To argue that an asset is not exempt because the debtor controls the claimed exemption implies the premise that all assets controlled by the debtor are not exempt.") Neither supports the conclusion that the WR Entities alleged status as affiliates of the Debtor somehow brings the WR Accounts into the bankruptcy estate.

Because the WR Accounts are property of the WR Entities, and not the Debtor, the Court should confirm that the WR Accounts are not property of the estate, and thus, not subject to the automatic stay.

**II.     The Ware Estate's personal attacks on Mr. Cardon are unprofessional and do not save the objection.**

Without a legal or factual basis to claim that the WR Accounts are property of the estate, the Ware Estate's counsel instead resorts to snide remarks and attacks on Mr. Cardon,[5] He accuses Mr. Cardon of having "amnesia" (Obj. at 3) and a "profound lack of knowledge" (*id.* at ¶ 13) during a prior deposition, and suggests that Mr. Cardon has submitted a contradictory affidavit when it became "expedient" (*id.* at ¶ 15) for him to do so.[6]  Ware's counsel appears to be developing a pattern: mischaracterizing the facts and telling only half of the story, to gain access to funds that are not the Ware Estate's to attach.

The crux of the Ware Estate's attack stems from a series of questions in which its counsel, Mr. Elster, *read Mr. Cardon the last four digits of 20 different bank accounts*, and then asked him if he could identify the holder of each account.  [Obj. at 7-9]  Not surprisingly, Mr. Cardon responded that he did not know the holder of those accounts, as he had not memorized the bank account numbers for 20 bank accounts nor had he memorized which accounts were held at the Bank (as opposed to other institutions).  Incredibly, the Ware Estate does not share with the Court what its counsel's opening remarks were, prior to embarking on this charade: "*I could read you these numbers, but you would have no idea what any of the account holders' names are; am I right?*"  See Exh. 2 attached (emphasis added).  The Ware Estate's counsel himself recognized (and stated on the record) that it was unreasonable to expect a witness to identify 20 different bank account numbers by owner,

---

[5] Mr. Cardon is the manager of Kastlerock, LLC, which is the manager of Capital Rock Holdings, LLC, the sole member of WRM.  [Cardon Decl. at ¶ 1-4]

[6] For the record, Mr. Cardon has not "disavowed" any relationship between the WR Entities and Home Opportunity, nor is he asking the Court to "ignore his prior representations."

1 then asked the questions anyway, and now sabotages Mr. Cardon with his responses, which
2 he unfairly categorizes as "amnesia." Again – this type of conduct is unproductive, and
3 should not be countenanced – particularly when it is engaged in by a lawyer not presently
4 authorized to practice law in Arizona.[7]

5 In that same deposition, Mr. Elster ultimately asked Mr. Cardon if he could name the
6 Window Rock related entities that bank at Alliance Bank. Mr. Cardon truthfully responded
7 as one would expect: "I would have to look at the books and records of the company, and I
8 could tell you with certainty which entities bank at Alliance." [Exh. B to Obj., at B08, ln. 4-
9 11] That is precisely what Mr. Cardon did in preparing his affidavit. He reviewed the
10 relevant account documents (none of which mention the Debtor). And he stated with
11 certainty what those account documents said.

12 The Ware Estate's attempt to undermine Mr. Cardon's Declaration, in order to shift
13 attention away from his own lack of evidence, is an unpersuasive attempt to undo the
14 obvious: there is no credible basis for its claims that Debtor owns or control the WR
15 Accounts.

### III. The Court should deny the Ware Estate's request for Rule 56(d) relief.

17 Forced (apparently) to concede that it was wrong when it told the Illinois State Court
18 that the loan documents prove that the Debtor controls the WR Entities and thus their bank
19 accounts, the Ware Estate now pivots away from the loan documents and instead requests
20 Rule 56(d) relief, based upon sheer speculation that there may be documents out there that
21 "might" demonstrate some form of control by the Debtor over the WR Accounts. But there

---

[7] Ware's counsel represented to the Court that he needed additional time to locate local counsel. [DE 21] Although, he subsequently submitted a pro hac vice application [DE 39] designating Mr. Gerald Shelley of Fennemore Craig as co-counsel, Mr. Shelley has yet to enter an appearance on behalf of Ware, and did not sign the Objection. Under LR 2090-1(b)(3), Ware's counsel cannot go forward without local counsel "unless the court orders otherwise . . ." As Fennemore Craig has not filed a Notice of Appearance, and the Court has not otherwise excused Ware from retaining local counsel, he is currently in violation of this rule.

are no such documents. Each of the WR Entities are separate corporate entities, with separate ownership, and separate investors. The Ware Estate has never challenged that fact. Each account is in the name of a separate company. The Ware Estate has never challenged that fact. Its request seeks nothing more than to rummage through the financial, confidential and proprietary business records of non-debtor third parties. That should not be permitted.

The Ware Estate also demands 56(d) relief to determine whether the Debtor funded the WR Accounts, asserting that the "evidence is solely and exclusively in the possession and/or control of the WR Entities." That request likewise has no merit.

As a threshold matter, the Trustee has the right to control <u>all</u> documents of the Debtor. As such, the Trustee can review the bank statements and (if he thinks it warrants the work) the general ledger for the Debtor's sole member, Red Rock River, which capture the Debtor's accounting activity.[8] This information can and will be made available. This simple task, which could easily be done in a couple of days, would allow the Trustee to verify what the Applicants already know – the WR Accounts contain no money that belongs to the Debtor.

Further, in seeking Rule 56(d) relief, counsel for the Ware Estate fails to mention that the Ware Estate has <u>already received</u> documents produced by the Debtor. The Ware Estate has taken deposition testimony. The Ware Estate has received documents produced by the Bank. The Ware Estate and the Trustee already had the benefit of the Section 341 exam. The Trustee also has made informal requests for information that has been promptly provided to the Trustee.

Simply stated, neither the Ware Estate nor the Trustee has a legal right to continue this fishing expedition against non-Debtor entities <u>and</u> continue to freeze these funds. At most, the Trustee needs to spend a day or two reviewing the books and records to verify that the

---

[8] The Debtor is a disregarded entity for tax purposes. It does not have its own bank statements nor does it file tax returns.

WR Accounts do not contain estate funds. With due respect, the Applicants have the right to control their own funds.

**IV. The application of the stay to non-debtor property is causing significant harm.**

By extending the automatic stay to the WR Entities and their funds, the Trustee and the Ware Estate are essentially (and indefinitely) using the Court and the Code to enjoin non-debtor parties and tie up their assets, all without even attempting to make a showing that such an injunction is warranted. The Ware Estate has not shown any likelihood of success on the merits, or even identified a plausible legal theory that it could pursue that might justify the prejudgment attachment of a non-debtor party's assets. Instead, the Ware Estate offers only unfounded speculation about "control", demanding that the WR Entities operate without access to their own money while the Ware Estate runs that nonsensical theory to the ground. As the WR Entities have repeatedly noted, however, this is causing them significant ongoing harm, which harm extends to unrelated third parties to whom the WR Entities owe various obligations. This is particularly evident in the case of CADI.

As set forth in Mr. Cardon's Supplemental Declaration attached hereto as Exhibit 1, CADI received a wire transfer from a counterparty in a confidential transaction (Servis) on April 6, 2021 in the amount of $886,955.22. Servis provided those funds on an arms-length basis, in the form of a refundable deposit, as part of a confidential transaction, and CADI deposited the funds in CADI's account. While confidential, CADI's transaction with Servis involves the transfer of certain mortgage servicing rights that are totally unrelated to the Debtor. The Servis transaction has not been consummated, and CADI may be required to return these funds – which are refundable - to Servis. *The funds do not belong to CADI.* Until or unless the transaction closes, the funds belong to Servis. Yet as a result of the Ware Estate's ongoing mischaracterization of the Loan Agreement, both CADI and Servis (not to mention vendors, investors unrelated to the Debtor, etc.) are deprived of their property. The Court should not allow this harm to continue.

## CONCLUSION

Pursuant to the arguments set forth above and in the Application, the Applicants respectfully request that the Court find that the Debtor has no interest in the WR Accounts, and thus, that the WR Accounts are not property of the estate.

DATED this 12th day of September, 2021.

**COPPERSMITH BROCKELMAN PLC**

By: /s/ *Marvin C. Ruth*
John C. Kelly
Marvin C. Ruth
Katherine L. Hyde
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
*Attorneys for Applicants*

COPY emailed September 12, 2021, to:

Terry A. Dake
P.O. Box 26945
Phoenix, AZ 85068-6945
tdake@cox.net
Attorney for Trustee

Matthew Elster
BEERMANN LLP
161 N. Clark St.
Suite 3000
Chicago, IL 60601
mdelster@beermannlaw.com
Attorneys for Creditor, Joseph Ware

/s/ Verna Colwell

{00567705.2}   11